**Opinion issued November 20, 2018**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-17-00522-CV

———————————

**ROBERT HARDIE TIBAUT BOWMAN AND POWERS L. BOWMAN, Appellants**

**V.**

**MOLLY BOWMAN STEPHENS, Appellee**

On Appeal from the 261st District Court
Travis County, Texas[1]
Trial Court Case No. D-1-GN-13-000636

## O P I N I O N

Three siblings are co-owners of a multi-million dollar, 117-acre, lakefront property along Lake Austin in central Texas. The two brothers want to sell the

---

[1] The Texas Supreme Court transferred this appeal from the Court of Appeals for the Third District of Texas. *See* TEX. GOV'T CODE § 73.001 (authorizing transfer of cases between courts of appeals).

property and divide the proceeds among the three siblings, but their sister wants to continue to keep the property in the family and enjoy its many features, including a boat dock she added recently. The brothers sued their sister, seeking a partition by sale. The trial court found the property was susceptible to partition in kind and appointed commissioners to allot portions of the property to each sibling to keep or sell at their discretion.

In three issues, the brothers appeal the judgment. They contend, first, the trial court erred by finding the property could be partitioned in kind without materially impairing its value; second, the trial court exceeded its authority by entering certain findings of fact and conclusions of law that went beyond the statutorily prescribed issues to be determined during the first phrase of a partition suit; and, third, the trial court's findings are not supported by legally and factually sufficient evidence.

We affirm.

**Background**

**A.     The siblings' dispute**

The parties to this suit are three adult siblings: Robert Hardie Tibaut Bowman, Powers L. Bowman, and Molly Bowman Stephens. They co-own a 117-acre lakefront property on Lake Austin they refer to as "Bowman Lake Place" or "Lake Place." It is comprised of two parcels of land that were purchased in

separate transactions by their grandmother in the 1950s. One tract is roughly 35 acres and has 900 feet of frontage along Lake Austin. The land gently slopes upward from the river. The property includes a modest house, boat dock, and gazebo. The other tract is roughly 85 acres and has steep slopes, heavy vegetation, and other topographical features that make it difficult to access. The upper tract is undeveloped. It is near but not in the Balcones Canyonland Conservation Plan's Preserve, which was created about 20 years ago to protect the natural habitat of local endangered species. These 85 acres are designated for future inclusion in the Preserve. The designation requires a landowner to go through a federal permitting process when developing the land.

There is no direct access to Lake Place from any public roads. The property owner next to Lake Place historically has allowed the siblings to use his property for access. From Pearce Lane, the siblings can enter the neighbor's property through his private gate, drive down the neighbor's private drive, and access a dirt road that leads to their property. Tibaut and Powers assert that the siblings have access rights "recognized in" their neighbor's Special Warranty Deed, which notes an "unrecorded right of access along a gravel road across" the property. Molly disputes her brothers' contention that there is a legally recognized right to access Lake Place through their neighbor's land; instead, in her view, there is only a

3

neighborly agreement that can be revoked by the neighbor at any time, which would result in Lake Place being landlocked without public access.

A few years ago, Tibaut and Powers approached Molly about selling Lake Place and splitting the sale proceeds. Molly did not want to sell. If her brothers demanded they convert their interest into cash, she preferred the property be partitioned in kind and she be allotted the portion that included the home she has always enjoyed during family gatherings and the boat dock she installed at her own expense. The brothers sued their sister, seeking a judgment that would require the sale of Lake Place and the division of sale proceeds among the siblings.

## B.    The trial court orders partition in kind

The first phase of the partition trial—in which the trial court, among other things, determines whether the property is susceptible to partition in kind—occurred in December 2017. Powers testified that he and his siblings jointly own and enjoy Lake Place as well as a 600-acre ranch in Kerr County. He acknowledged that access to Lake Place "has been a concern" because there are no public roads that reach its borders. Instead, they must rely on their western neighbor, who always has allowed access through his property. Powers testified that "the only purchaser in the world that would not have a problem with access to the Lake Place" would be that neighbor.

4

Powers testified that he and Tibaut once raised with Molly the possibility of selling just the back 85 acres. He said he had been told it was worth $500,000 to $2.5 million, though he did not identify who provided that valuation. He and Tibaut wanted to use the money to finance additional development of the 600-acre ranch the siblings jointly own. Powers acknowledged a sale in that price range would not have provided adequate funds to fully finance their development plans.

Eric Moreland, a real estate broker, testified about two offers that had been made to purchase Lake Place. First, the neighbor who allows access offered to buy Lake Place for $8 million. Second, after Tibaut approached Moreland and requested that Moreland find a potential buyer, Moreland secured a second offer of $12.7 million for the property. One of the brothers' experts, George Ezell, testified that, to his knowledge, the $12.7 and $8 million offers were the only offers that have been made to purchase the full 117-acre tract.

Charles Dunn of Hutson Land Planner was hired by Molly to analyze the highest and best use of Lake Place. He testified that the upper and lower parcels have different highest and best uses. The upper 85 acres is within an endangered species area and is subject to development limitations and potential federal oversight; therefore, its highest and best use is recreational. The lower 35 acres has river access, making it more valuable on a per-acre basis. According to Dunn, its

highest and best use is as a lakefront residential development. Dunn testified that the property's value is negatively impacted by the lack of street frontage.

Dunn testified that a partition in kind would meet the brothers' needs and Molly's needs and, in his view, would allow them to "make the same amount of money they would have made" if the property were sold as a single unit. Dunn considered several hypothetical divisions, including one that would create three lakefront properties with shared access to the 85-acre back parcel to be enjoyed by all three landowners under a conservation easement. He said his hypothetical divisions were only tentative because the parties were still in the partition trial's first stage, which is limited to addressing the issue of whether the property *could* be divided, not specifically *how* it should be divided. Dunn stated he was not offering an opinion that the property should be divided in any particular way, as that was outside the scope of his involvement and the proceeding's current stage.

Powers and Tibaut's expert, George Ezell, is a land appraiser. He performed a valuation of Lake Place that relied, in part, on information he obtained from an attorney, Terry Irions. Irions had told Ezell that Lake Place has access to public roads through a prescriptive easement on the neighboring property. Based on this information from Irions, Ezell included an "extraordinary assumption"[2] in his

---

[2] An extraordinary assumption in this context is a term of art in the field of valuations. The Uniform Standards of Professional Appraisal Practice (USPAP) defines an extraordinary assumption as an "assumption, directly related to a

valuation that public access to Lake Place through a neighbor's land is granted through a "prescriptive easement."[3] Ezell testified that his valuation "absolutely" could change if his prescriptive-easement assumption proved incorrect.

Irion testified similarly, stating that the "only access to this property is from the prescriptive easement." On further questioning, he stated that there is an "inference" that an easement exists in the neighbor's deed. He did not otherwise analyze whether a prescriptive easement exists across the neighbor's property.

Tibaut, who is a lawyer, also opined that Lake Place currently enjoys a prescriptive easement across the neighbor's land, meaning there is a legal right to access the property through that land.

The testimony that a prescriptive easement exists to grant access to Lake Place was tempered by other evidence. In a letter sent to his siblings prelitigation, Tibaut discussed how they might obtain a deeded easement from their neighbor by offering to help pay the cost of paving the neighbor's private drive. Tibaut's letter

specific assignment, as of the effective date of the appraisal results, which, if found to be false, could alter the appraiser's opinions or conclusions." *See* Phil Spool, *Extraordinary Assumption or Hypothetical Condition?*, ORG. OF REAL ESTATE PROF'LS, http://www.workingre.com/extraordinary-assumption-or-hypothetical-condition/ (last visited October 31, 2018). In essence, an extraordinary assumption is "what you assume to exist." *Id.*

[3] A prescriptive easement is an "easement created from an open, adverse, and continuous use over a statutory period" and is equivalent to an "adverse easement." *See Prescriptive Easement*, Black's Law Dictionary (10th ed. 2014).

stated that the siblings "NEED a deeded easement" for access and "may be able to get it in the paving process."

Using his extraordinary assumption that a prescriptive easement exists, Ezell testified Lake Place's value, as a single 117-acre parcel, considering the property's characteristics and highest and best use, as well as comparable sales in the area, is $27.3 million—more than double the highest documented offer to date.

Ezell performed a second valuation after dividing the property into three hypothetical parcels with roughly equal values. He relied on a hypothetical division discussed by Molly's expert, Dunn. According to Ezell, if the 117 acres were dividing into these three parcels, their combined value would be $17.4 million. In other words, according to Ezell, the property has more value as a single tract of land ($27.3 million) than if partitioned into three parcels ($17.4 million).

Molly's real estate appraiser, David Bolton, testified that he considered the highest and best uses of the upper and lower parcels separately, evaluated a variety of possible land-division scenarios, and concluded that the 117-acre tract had a total value between $13.5 and $16.6 million. He reached this valuation by treating the upper and lower parcels as separate "economic units" with different highest and best uses and then valuing the two parcels individually and adding the two values. He testified that a buyer would evaluate the property similarly. The brothers were critical of Bolton's valuation, arguing that he failed to value the

8

property as a single, 117-acre unit. Bolton responded that treating the property as two separate economic units and aggregating their values was equivalent because common ownership of the two economic units did not increase their values.

Molly testified that she wants to keep the inherited Lake Place, not be forced to sell it. While her brothers "view it as an asset to be sold," she wanted to continue "owning and enjoying" it. Molly asserted it would be fair, in her view, for her brothers to receive "something like 80 acres" to sell and for her to receive a separate land portion to keep and enjoy. She had no desire to prevent her brothers from selling their share of the land, but she did not want to be forced to sell too. According to Molly, as long as their allotted portions had similar economic values, it should not matter to her brothers which part of the property they received.

Molly testified that the house at Lake Place has no economic value but does have sentimental value to her. She also testified that she replaced an old boat dock that had become unusable and dangerous with a new dock without any financial assistance from either brother. Given her brothers' desire to sell, in Molly's view, it would be fair to allot to Molly the portion of Lake Place that contained the home she loved but added no value to the land and the boat dock she paid for.

Regarding access to Lake Place, Molly testified that she never shared Tibaut's belief that the neighbor would provide a written easement in exchange for paving a "little stretch of road." She stated that Tibaut's idea was "naive" and that

9

the lack of access negatively affected the property's value. To address partitioning in light of the uncertain access rights, Molly suggested the property be partitioned such that her brothers be allotted two adjoining parcels closest to the neighbor who provided their access. This would allow her brothers to sell their parcels to the neighbor who provided the access and who had shown an interest in purchasing the property in the past, and it would allow her to keep the modest house and boat dock on the other side of the property.

The trial court issued one initial fact finding in January 2017: "I find that the property in question is susceptible to fair and equitable partition in kind at this time, with Ms. Molly Stephens being entitled on the equities to the portion of the property containing the home and boat dock."

## C.    The brothers challenge the finding

Tibaut and Powers filed an "objection" to the finding that Molly was entitled to a particular portion of land. They argued that such a finding was outside the scope of the partition trial's first stage and encroached on the commissioners' role in the second stage. They asked the trial court to reconsider its ruling. The brothers filed a second challenge, arguing that they had "anticipated that if the Court determined that the property was capable of partition 'in kind' . . . then a determination of which of the siblings would get which 'piece' of the 'in-kind' partitioned tract would be within the purview of the Commissioners or the court at

10

the 'Second' trial after the Commissioners have done their work." Molly responded with a letter brief, arguing equitable determinations on whether a particular co-owner should have been allotted a particular portion of divisible property were properly made in the suit's first stage.

## D.     The trial court's judgment and additional fact findings

The trial court did not rule on the brothers' objection or request for reconsideration. Three months after its initial ruling, the trial court signed a judgment ordering partition in kind and appointing commissioners. The judgment stated that Tibaut, Powers, and Molly each owned an undivided one-third interest in Lake Place, Lake Place was susceptible to fair and equitable partitioning, and it "shall be partitioned into 3 tracts of equal value and each party shall be entitled to one tract." The judgment contained directions to the commissioners to ensure each partitioned tract had reasonable access to Pearce Road by granting non-exclusive access easements across the partitioned tracts. Finally, it ordered that the property be partitioned "such that the value of the tracts allotted to each party reflects that party's interests as recited above, and, as equity dictates."

The trial court signed additional fact findings and legal conclusions the following month. The court made specific findings concerning the characteristics of the property, including the topography of the lower 35 acres and the upper 85 acres, as well as its access. The findings stated that the owner of the neighboring

western property historically had permitted and continued to permit access to Lake Place, but that there was no written or recorded easement describing the scope or extent of a claimed access right. The trial court found that the "uncertainty of access would be a significant issue for any prospective buyer of Lake Place and would likely reduce the price that a buyer would pay for all or any part of the property."

Regarding the case equities, the trial court found that the house had "historical sentimental value" to Molly and her children, "both sides" of the litigation had concluded that the house had "no determined market value," meaning allotting to one party the segment of the property that contained the house would not add value to that party's allotment in comparison to any other segment without improvements, and the boat dock was built by and paid for exclusively by Molly without participation or contribution by her brothers.

The trial court then concluded that, "[r]ecognizing that Texas law favors partition in kind, and that the party seeking partition-by-sale bears the burden of proving that a partition in kind would not be fair or equitable . . . Lake Place is susceptible to fair and equitable partition in kind"; that partitioning the property in kind "would not materially impair its value"; and that requiring Molly to sell her undivided interest in Lake Place "would not be reasonable, fair, or equitable." The trial court further concluded that partitioning Lake Property "into three separate

12

parcels will not cause its overall value to be substantially less than the sum of the three partitioned parcels."

Citing *Price v. Price*, 394 S.W.2d 855 (Tex. Civ. App.—Tyler 1965, writ ref'd n.r.e.), the trial court found "no reason to stray" from the "long-established rule" that, if "one party makes or pays for improvements, the improved portion will be allotted to that person." The trial court then instructed the commissioners to "determine where to divide the property into three parcels."

Tibaut and Powers appeal the trial court's judgment.

## Partition of Jointly Owned Real Property

### A.    Applicable law and standard of review

#### 1.    Options for ending joint ownership

The law will not force a reluctant joint owner of real property to maintain a joint ownership. Instead, joint owners of real property "may compel a partition of the interest or the property among the joint owners." TEX. PROP. CODE § 23.001. Partitions may be in kind (meaning that property is divided into separate parcels and each parcel is allotted to a separate owner) or by sale (meaning that property is sold and sale proceeds are divided among the owners). *Carter v. Harvey*, 525 S.W.3d 420, 429 (Tex. App.—Fort Worth 2017, no pet.). Texas law favors partition in kind over partition by sale. *Id.*; *Jimmie Luecke Children P'ship, Ltd. v.*

13

*Pruncutz*, No. 03-03-00388-CV, 2005 WL 910144, at *2 (Tex. App.—Austin Apr. 21, 2005, pet. denied) (mem. op.).

The threshold question in a partition suit is whether the property is "susceptible of partition" in kind or if it is, instead, "incapable of partition" in kind because a "fair and equitable division" cannot be made. TEX. R. CIV. P. 761, 770; *see Pruncutz*, 2005 WL 910144, at *2. A tract may be incapable of partition in kind even though a partition in kind is not "physically impossible." *Hopkins v. Hopkins*, No. 03-03-00629-CV, 2006 WL 1126222, at *8 (Tex. App.—Austin Apr. 27, 2006, pet. denied) (mem. op.). The issue is whether partition in kind is so "impractical or unfair" that "partition by sale would best serve the parties' interest and restore or preserve the maximum value of the property." *Id.*

The party seeking to obtain a partition by sale (instead of the legally favored partition in kind) has the burden to demonstrate that partition in kind is "impractical or unfair." *Id.* "Generally, where the evidence is conflicting or admits of more than one inference, it is a question of fact for the jury or the trier of facts whether or not a partition in kind is feasible or a sale for division necessary." *Robertson v. Robertson*, 425 S.W.2d 707, 708 (Tex. Civ. App.—Houston [14th Dist.] 1968, no writ).

One of the recognized factors for determining whether property is incapable of partition in kind is whether it can be divided without "materially impairing its

14

value." *Carter*, 525 S.W.3d at 429; *Daven Corp. v. Tarh E&P Holdings, L.P.*, 441 S.W.3d 770, 777 (Tex. App.—San Antonio 2014, pet. denied) (stating that "determination of whether a partition-in-kind is fair and equitable includes whether the 'property can be divided in kind without materially impairing its value'") (quoting *Champion v. Robinson*, 392 S.W.3d 118, 123 (Tex. App.—Texarkana 2012, pet. denied)); *see Cecola v. Ruley*, 12 S.W.3d 848, 855 (Tex. App.—Texarkana 2000, no pet.) (referring to issue of whether value is materially impaired through in-kind partition as "factor" to be considered when determining whether partition should be in kind or by sale), *superseded by statute in part*, TEX. PROP. CODE § 23.006, *as recognized in Champion*, 392 S.W.3d at 124.

Even if partition in kind is possible and will preserve the land's value, a trial court may reasonably conclude partition in kind is "not feasible, fair, practical, or equitable" given the parties' interests in the property. *Carter*, 525 S.W.3d at 435 (noting rules of equity govern partition and trial court is in best position to determine equities between parties); *but see Pruncutz*, 2005 WL 910144, at *4 (concluding that party's concerns about where to physically divide property are premature in challenge to first stage of partition litigation, which focused only on if property could be partitioned in kind).

If the trial court determines property is incapable of partition in kind, then the trial court must order partition by sale. TEX. R. CIV. P. 770; *Estate Land Co. v.*

*Wiese*, No. 14-13-00524-CV, 2015 WL 1061553, at *3 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, pet. denied) (mem. op.).

## 2.    Stage one of partition proceeding

The Rules of Civil Procedure set forth a two-stage process for the partition of real estate. *See* TEX. R. CIV. P. 756–771; *Yturria v. Kimbro*, 921 S.W.2d 338, 341 (Tex. App.—Corpus Christi 1996, no writ). Each stage results in a final, appealable judgment. *Yturria*, 921 S.W.2d at 342. In the first stage, the trial court, as factfinder, determines whether the property is susceptible to partition in kind and decides the fractional interest of each joint owner in the land sought to be divided, all questions of law or equity affecting the title to such land, and the value of improvements so as to provide for the adjustment of equities between the parties. *See* TEX. R. CIV. P. 761; *Yturria*, 921 S.W.2d at 341–42; *Bolinger v. Williams*, No. 07-14-00024-CV, 2015 WL 9473924, at *2 (Tex. App.—Amarillo Dec. 21, 2015, no pet.) (mem. op.). To do so, the trial court evaluates evidence of the "existence and value of improvements"[4] and "other equitable considerations which may warrant awarding a particular portion of the property to one of the parties." *Yturria*, 921 S.W.2d at 342. The factfinder also resolves disputed fact

---

[4]    The "property owner rule" creates a rebuttable presumption that a property owner is familiar with her property and its fair market value. *See Reid Rd. Mun. Util. Dist. No. 2 v. Speedy Stop Food Stores, Ltd.*, 337 S.W.3d 846, 850 (Tex. 2011); *Bolinger v. Williams*, No. 07-14-00024-CV, 2015 WL 9473924, at *4 (Tex. App.—Amarillo Dec. 21, 2015, no pet.) (mem. op.). Unless rebutted, a property owner is presumed to be qualified to testify as to the market value of her own property. *See Bolinger*, 2015 WL 9473924, at *3 n.7.

issues, including whether there are improvements to the property and their values and whether joint owners invested in those improvements. *Id.* The trial court weighs the equities to determine whether a certain owner should retain, in the partition, a particular portion of the property. *Id.*

"The general rule is that where improvements have been made upon the property sought to be partitioned, the improved portion will be allotted to the part owner who has made the improvements if this can be done without prejudice to the other owners." *In re Estate of Hoyt*, No. 13-10-00490-CV, 2011 WL 5999866, at *3 (Tex. App.—Corpus Christi Dec. 1, 2011, pet. denied) (mem. op.); *Price*, 394 S.W.2d at 858; *Bouquet v. Belk*, 376 S.W.2d 361, 362–63 (Tex. Civ. App.—San Antonio 1964, no writ). Further, a cotenant who expends money necessary to protect or preserve the common property is entitled to have those expenditures charged to the tenants in common according to their pro rata ownership. *McGehee v. Campbell*, No. 01-08-01023-CV, 2010 WL 1241300, at *3 (Tex. App.— Houston [1st Dist.] Mar. 25, 2010, no pet.) (mem. op.). These include money paid for taxes, insurance, and repairs. *Id.* However, a cotenant who improves property without the consent of his cotenant is not entitled to recover these expenditures. *Id.* at *5. Instead, the amount of recovery for such improvements is limited to the value of the enhancement of the property at the time of the partition. *Id.*

At the conclusion of the first stage of the partition litigation, a trial court may conclude that the property is susceptible to partition in kind and appoint and instruct commissioners to divide the property, taking into account the equitable and legal matters resolved in the first stage. *Yturria*, 921 S.W.2d at 342.

A party with an equitable claim to a particular tract of land within the whole must have pursued its claim at the proceeding's first stage. *Campbell*, 3 S.W.3d at 260. Matters that were or that should have been decided in the first stage cannot be challenged in an appeal from the second judgment that issues at the completion of the second stage. *Campbell*, 3 S.W.3d at 259.

### 3. Stage two of partition proceeding

In the second stage, the commissioners consider the property's characteristics and evaluate objective considerations for dividing the property to retain the partitioned tracts' highest value. *Yturria*, 921 S.W.2d at 343. The commissioners have no judicial powers or authority to consider equitable claims not already determined by the factfinder. *Id.* at 342. Equitable considerations must have been made and determined in the partitioning process's first stage; the commissioners then rely on the equitable determinations to decide where to divide the property, taking into account property valuations. *Id.*

The commissioners determine a property division and make a report to the trial court, under oath, recommending the actual property partition. TEX. R. CIV. P.

18

766, 769; *Bolinger*, 2015 WL 9473924, at *3. Within 30 days, any party to the partition suit may file objections with the trial court. TEX. R. CIV. P. 771. The trial court's second judgment may approve the commissioner's report and "set aside to the joint owners or claimants their fractional share or interest in the disputed property in accordance with that report, or it may find the report 'to be erroneous in any material respect, or unequal and unjust' and reject it." *Bolinger*, 2015 WL 9473924, at *3 (quoting *Campbell*, 3 S.W.3d at 259).

Once the commissioners determine where jointly owned property should be divided so the subparts have equivalent values, the determination of which party obtains rights to which equally-valued parcel is generally made by lot. TEX. R. CIV. P. 768. But a court need not partition by lot if "the interests of the parties in the realty to be partitioned are unequal." *Grimes v. Hall*, 211 S.W.2d 956, 958 (Tex. Civ. App.—Eastland 1948, no writ); *see Campbell v. Tufts*, 3 S.W.3d 256, 260 (Tex. App.—Waco 1999, no pet.); *Carr v. Langford*, 144 S.W.2d 612, 614 (Tex. Civ. App.—Dallas 1940, no writ) (concluding that one owner should be allotted portion that includes house and improvements and other two owners should be allotted larger acreage shares, assigned by lot), *aff'd*, 159 S.W.2d 107 (Tex. 1942).

In sum, equitable claims that favor awarding a specific portion of a particular tract to a particular party, and issues regarding the existence and value of improvements, are determined in the partition proceeding's first stage. *Yturria*, 921

19

S.W.2d at 342–44. During the second stage, the "exact manner of valuing the real property" and appropriate method of "dividing that property into shares among the parties is accomplished by the commissioners." *Id.* at 342.

### 4. Appellate review of judgment

The rules of equity govern the trial court's partition of property. *Williams v. Mai*, No. 01-11-00611-CV, 2012 WL 6644704, at *4 (Tex. App.—Houston [1st Dist.] Dec. 20, 2012, no pet.) (mem. op.). A trial court exercises broad discretion in balancing the equities involved in a case seeking equitable relief. *Stracener v. Stracener*, No. 12-10-00270-CV, 2011 WL 2766802, at *1 (Tex. App.—Tyler July 13, 2011, no pet.) (mem. op.). An appellate court will not disturb a trial court's ruling on a claim seeking equitable relief unless it is arbitrary, unreasonable, or without regard to guiding legal principles. *Williams*, 2012 WL 6644704, at *4. When facts are disputed, a trial court does not abuse its discretion if some of the conflicting evidence supports its decision. *City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005).

In a bench trial, the trial court determines the credibility of the witnesses and the weight to be given their testimony. *Id.* at 819; *Miranda v. Byles*, 390 S.W.3d 543, 553 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). In resolving factual disputes, the trial court may believe one witness and disbelieve others, and it may resolve any inconsistencies in any witness's testimony. *McGalliard v. Kuhlmann*,

722 S.W.2d 694, 697 (Tex. 1986). In making credibility determinations, the factfinder "cannot ignore undisputed testimony that is clear, positive, direct, otherwise credible, free from contradictions and inconsistencies, and could have been readily controverted." *City of Keller*, 168 S.W.3d at 820. Even uncontroverted expert testimony is not binding on a factfinder if the subject of the testimony is not one for experts alone. *Id.* But the factfinder is not "free to believe testimony that is conclusively negated by undisputed facts." *Id.*

A trial court's factual findings, express and implied, are not conclusive and may be challenged for legal and factual sufficiency of the evidence. *Miranda*, 390 S.W.3d at 553. We review the sufficiency of the evidence supporting a trial court's challenged fact findings by applying the same standards we use in reviewing the sufficiency of the evidence supporting jury findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994). The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827. In making this determination, the reviewing court credits favorable evidence if a reasonable factfinder could, and disregards contrary evidence unless a reasonable factfinder could not. *Id.* If the evidence falls within the zone of reasonable disagreement, then the reviewing court may not substitute its judgment for that of the factfinder. *Id.* at 822. In reviewing factual sufficiency, we consider and weigh all the evidence

21

supporting and contradicting the challenged finding and set aside the finding only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Miranda*, 390 S.W.3d at 553. A reviewing court may review the legal conclusions drawn from the facts to determine their correctness. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002).

A reviewing court applies a de novo standard to review a trial court's conclusions of law in a bench trial and will uphold them if the judgment can be sustained on any legal theory supported by the evidence. *City of Keller*, 168 S.W.3d at 822; *In re Moers*, 104 S.W.3d 609, 611 (Tex. App.—Houston [1st Dist.] 2003, no pet.). If the reviewing court determines a conclusion of law is erroneous, but the trial court nevertheless rendered the proper judgment, the error does not require reversal. *BMC Software*, 83 S.W.3d at 794.

An appellate court will not set aside a judgment because of conflicting findings of fact by a judge or jury if the conflict can be reconciled. *Wiese*, 2015 WL 1061553, at *4. The appellate court must reconcile apparent conflicts if there is any reasonable basis to do so. *Id.*

**B.    Whether the trial court abused its discretion in determining that Lake Place was susceptible to partitioned in kind**

In their first issue, Tibaut and Powers challenge the trial court's determination that Lake Place is susceptible to partition in kind without materially impairing its value.

**1.    Trial court's findings underlying its ruling**

The trial court found that the appraisal report submitted by the brothers' retained expert, Ezell, was "not credible evidence of the current 'as is' value of the Bowman Lake Place because it failed to consider the impact on value" of the "uncertainty of access," the property's inclusion in the proposed Balcones Canyonlands Preserve, and the potential presence of endangered species on the property.

The trial court found Molly's valuation evidence to be persuasive. Her expert, Bolton, opined that the total market value of the property was $13.5 million and that its value would not be materially reduced by partitioning it into three parcels of approximately equal value.

While specifically recognizing that "Texas law favors partition in kind, and that the party seeking partition-by-sale bears the burden of proving that a partition in kind would not be fair or equitable," the trial court found that Lake Place "is susceptible to fair and equitable partition in kind," which "would not materially impair its value." The trial court further found that Tibaut and Powers "failed to

rebut the presumption that the Bowman Lake Place may be fairly and equitably partitioned in kind" and "failed to show that the value . . . would be materially impaired if it were partitioned into three shares of approximately equal value."

## 2. Tibaut and Powers's arguments

Tibaut and Powers argue that the findings have no basis in evidence because only their expert appraiser, Ezell, offered testimony concerning Lake Place's value as a single unit. Ezell appraised the property's value as a single unit at $27.3 million,[5] while Molly's expert, Bolton, divided Lake Place into two economic units and added those values to determine the value of the whole. Moreover, according to the brothers, the trial court erroneously concluded that Ezell had omitted material information from his analysis.

## 3. The evidence

Tibaut and Powers presented only two witnesses at trial: Powers and Ezell. Ezell is a real estate appraiser with 25 years' experience.[6] Ezell appraised the property two ways: first, as a single 117-acre unit, and, second, as three separate tracts of land following a hypothetical partition first offered by Dunn.

---

[5]  As noted, Ezell's valuation was $10 million more than Bolton's valuations and more than double the highest third-party offer received to purchase Lake Place.

[6]  Expert testimony, like Ezell's, is subject to the trial court's credibility and persuasiveness evaluation. *See City of Keller v. Wilson*, 168 S.W.3d 802, 820 (Tex. 2005). The trial court is free to reject expert testimony, even uncontroverted expert testimony, unless it is a subject for experts alone. *See id.*

According to Ezell, his valuations included an "extraordinary assumption" that the owners of Lake Place hold a prescriptive easement with access rights through the neighboring property. He agreed that his valuation conclusion would change if the extraordinary assumption proved not to be true. Ezell was asked, "You have said that you're assuming that there is this access . . . and if you're wrong about that, it can change your mind [about the property's value]." He responded, "Absolutely."[7]

The neighbor's deed that conveyed the adjoining property to him was admitted into evidence. It conveyed the land subject to four items: a flood easement in favor of the City of Austin, two physical encroachments on the property, and an "unrecorded right of access." The neighbor's deed did not specify a legal basis for access. Nor did it identify the party who owned the right or the scope of the right. The record does not contain a deed or any other document granting the Bowmans and Stephens a right of access across the neighbor's tract.

Ezell also was asked about the Balcones Canyonland Preserve. He stated that local landowners have the option to sell land to be included in the preserve but would not be forced to do so. Therefore, according to Ezell, the Balcones Canyonland Preserve and accompanying initiatives had "no impact" on the property's value.

---

[7]     Ezell testified that Molly's expert, Bolton, made the same access assumption.

25

Ezell testified that the highest and best use of the property was as a "private lakefront estate." He agreed that the "general rule" is that large property is more valuable when subdivided and sold as multiple, smaller units. But he stated that there are exceptions. Ezell noted that the trend in the Lake Austin market is to aggregate smaller pieces of land to create large estates, not to subdivide.

Ezell used the sales comparison approach to assign a value for the property.[8] Using this approach, he compared Lake Place to other recently sold properties with similar characteristics.[9] The comparable sales selected by Ezell were as follows:

- Comp #1: 29 acres that sold for approximately $8 per square foot in 2010.

- Comp #2: 44 acres located just over a mile from the subject property that sold for approximately $15.45 per square foot in 2007. The property fronted Ranch to Market Road 2222 and was platted for 21 single-family lots at the time of sale. Contrary to the plotting, the purchaser built a very large, single family home on the land. Ezell testified that this was consistent with other development near the lake and indicated that the highest and best use of Lake Place was as a private, lakefront estate.

- Comp #3: 144 acres located "a quarter mile down the lake from the subject" property that sold for $5.55 per square foot (for a total price of $35 million) in November 2014. Ezell acknowledged, though, that this "comparable" property is platted to be divided into 71 lots, a feature Lake Place does not share.

- Comp #4: 25 acres that sold for $4.56 per square foot.

---

[8] Molly's expert, Bolton, also used the sales comparison approach.

[9] There were differences though. All four comparable sales identified by Ezell had public road access and were outside the Balcones Canyonland Preserve.

26

In Ezell's opinion, based on these comps, Lake Place had a market value of $27.3 million at $5.25 per square foot. Under Ezell's valuation, each square foot was assigned an identical value per square foot. In other words, a square foot of land on the edge of Lake Austin (within the lower 35 acres) was worth $5.25, just like a square foot one mile away (within the upper 85 acres of steep terrain).

When Ezell's per-square-foot value was considered in the context of the two hypothetical halves of Lake Place, it resulted in the lower 35 acres being worth approximately $8 million and the upper 85 acres being worth considerable more—$19 million.[10]

Ezell testified that he had not been asked to determine the value of the lower 35-acre parcel apart from the 85-acre parcel. Nor had he been asked to value a hypothetical parcel of land roughly equivalent to two-thirds of the whole (which would be relevant under a scenario in which Tibaut and Powers were allotted 40 acres each that were then combined for sale as a single parcel).

Ezell's second valuation used Dunn's hypothetical partition of Lake Place into three tracts, each with some lakefront land in the lower 35-acres, some

---

[10] By contrast, Powers testified that he had been told, before and during the litigation, that the upper 85 acres were worth "from $500,000 to about $2.5 million." And Bolton testified that the upper 85 acres were worth approximately $1 million.

undeveloped land in the back 85 acres, and a narrow connecting strip of land to join the two. Each hypothetical tract was approximately 40 acres in size.

In performing this second valuation, Ezell again used Comp #1 (29 acres at $8 per square foot), Comp #3 (144 acres at $5.55 per square foot), and Comp #4 (25 acres at $4.56 per square foot). However, he elected not to use Comp #2 (44 acres at $15.45 per square foot). Ezell testified he did not use the 44-acre Comp #2 when determining the value of three 40-acre parcels—even though Comp #2 was "very similar in size"—because Comp #2 and the 40-acre parcels "don't look anything alike." He agreed that he had found the $15.45-per-square-foot comp to be a usable comp when he evaluated Lake Place as a single, 117-acre tract.

Ezell replaced the $15.45-per-square-foot Comp #2 with a different "Comp #2" for his second valuation. The replacement Comp #2 was an 11-acre tract that sold for $2.53 per square foot, making it the lowest per-square-foot value included in either of Ezell's valuations. Ezell agreed that this substitution of the low $2.53 value for the high $15.35 value resulted in a lower total value under the partitioned model that Molly preferred than the value reached using the single-tract model that Tibaut and Powers preferred.

To recap, in Ezell's first valuation, after taking into account the value per square foot of the four designated comparable tracts, Ezell valued the 117-acre lot at $5.25 per square foot, no matter its proximity to the lake or its topography, for a

total value of $27.3 million. In his second valuation, after removing the highest-value comparable and replacing it with what became the lowest-value comparable, Ezell valued the three hypothetically partitioned tracts such that their aggregate value was $17.48 million. Relying on these valuations, Ezell testified that Lake Place was worth $10 million more as a single tract than as three partitioned parcels.

In contract, Bolton testified that the 117-acre tract had a total value of between $13.5 and $16.6 million. He analyzed the upper and lower parcels as separate "economic units" with different highest and best uses and then valued the two parcels individually and added those values. He testified that a buyer would evaluate the property similarly. Bolton responded to the brothers' criticism that he had failed to value the property as a single unit for comparison purposes: he testified that common ownership of the two economic units did not increase their values. According to Bolton, the aggregation of the two economic units' values was equivalent to a valuation of the property as a single unit. And Dunn testified that, in his view, a partition in kind would provide the separate land owners with parcels worth "the same amount of money" as their partial interest in the property as a single unit.

4. **Trial court did not abuse its discretion in concluding that Lake Place was susceptible to being partitioned in kind**

In preparing his two valuations, Ezell opined that a relatively expensive 44-acre lot ($15.45 per square foot) was comparable to Lake Place as a single, 117-

acre lot, and he used that comp to assess a value for Lake Place as a single tract of land. As part of that valuation, Ezell applied the same price per square foot to all 117 acres, even those far removed from the lake frontage with very different topography.

Yet Ezell did not find the relatively expensive 44-acre lot to be comparable to three hypothetically partitioned, 40-acre lots, and therefore did not include it in that valuation. Instead, he substituted a relatively inexpensive ($2.53 per square foot) 11-acre lot as a comp. Eleven acres is not a comparable size to the hypothetically partitioned 40-acre lots. By applying the 11-acre comp, Ezell, in effect, was equating the partitioned lands—which include roughly 10 lakefront acres plus roughly 28 rugged acres—to a single lot of roughly 11 lakefront acres. The trial court reasonably could have concluded this valuation method overly discounted the value of the upper parcels in a manner inconsistent with Ezell's early assertion that each square foot held equal value. Moreover, the 11-acre comp Ezell selected had been noted to be "approximately 50%" within the 100-year floodplain, which the trial court reasonably could have viewed as not equivalent to Lake Place. Ezell did not make an adjustment to his valuations for this feature of the replacement Comp #2 in either his report or his testimony.

The trial court also could have reasonably concluded that Ezell's selection of a lower-value comparable and rejection of a higher-value comparable undermined

Ezell's credibility. *See City of Keller*, 168 S.W.3d at 820. Further, assigning a per-square-foot value that is appropriate for lakefront property to every square foot of a 117-acre property, including those portions one mile from the lake, is a valuation technique that could have weighed on the trial court's credibility determination.

The trial court also reasonably could have determined that Ezell's valuations lacked consistency. When valuing a single 117-acre tract that his clients were advocating, Ezell concluded that a relatively expensive 44-acre, lakefront lot was comparable. But when valuing three roughly-40-acre lots that the opposing litigant favored, Ezell concluded that the relatively expensive 44-acre lot was no longer comparable; instead, an 11-acre lot was deemed a better comp, resulting in an overall reduction in value of $10 million. The trial court was free to not credit this evidence in support of Tibaut and Powers's contention that partition in kind would "materially impair" Lake Place's value. *See Carter*, 525 S.W.3d at 429.

Bolton testified that the 117-acre tract had a total value of between $13.5 and $16.6 million, and Dunn testified that, in his view, the parties would be in the same financial position with partition in kind as they would otherwise.

Tibaut and Powers had the burden to demonstrate that partition in kind would not be fair and equitable. *Hopkins*, 2006 WL 1126222, at *8. The trial court was presented conflicting evidence on Lake Place's value as a whole and as partitioned. After making credibility determinations and weighing the conflicting

31

evidence, the trial court concluded that Lake Place was susceptible to partition in kind without materially impairing its value. We conclude that the trial court did not abuse its discretion in doing so.

We overrule Tibaut and Powers's first issue.

**C.    Whether the trial court exceeded its authority with regard to findings of fact and conclusions of law during the first phase of the partition suit**

In their second issue, Tibaut and Powers contend that the trial court "effectively collapsed the two trials into one and tied the hands of the commissioners, such that their work and the second trial are largely rendered meaningless." They argue that the trial court's findings "went beyond the questions of ownership or susceptibility to partition, misstate the law, and reflect an attempt to prevent [them] from arguing at the second trial equitable considerations that are appropriate at the second phase of a partition action." Tibaut and Powers read *Yturria* to support their argument.

*Yturria* states the opposite: "In addition to determining the basic issues of partitionability in kind and the fractional interests of the parties, the trial court also has the power during the initial stage of the partition proceeding to adjust all equities between the parties"; in contract, the "[c]ommissioners in partition have no judicial powers and no authority to take into consideration equitable claims that have not already been determined by the factfinder" in the first stage. *Yturria*, 921 S.W.2d at 342. Thus, all equitable determinations must be made in the initial stage

32

of the partition trial. *Id.* Then the commissioners are charged with actually dividing the property based on the trial court's equitable findings and instructions and their own objective considerations of the best manner of dividing the property so as to abide by the trial court's instructions while achieving the partitioned tracts' highest value. *Id.* at 343.

The commissioners may receive expert testimony pertaining to where and how to divide the property (consistent with the trial court's findings), but their role is not judicial; they have "no judicial powers." *Id.* at 342. Instead, they bring expertise in real estate matters to the remaining real estate questions after the trial's first phase.

Tibaut and Powers also argue that many of the trial court's findings are irrelevant because the trial court's judgment did not expressly conclude that Molly should be allotted the portion of Lake Place that contained the house and boat dock. While the judgment did not specifically contain such a finding, its terms, in combination with the court's other findings of fact and conclusions of law unambiguously instruct the commissioners that the house and boat dock were, in equity, to be allotted to Molly.

The judgment stated the trial court's conclusion that the "property is susceptible to fair and equitable partitioning" and ordered that the property be partitioned "such that the value of the tracts allotted to each party reflects that

party's interests as recited above, and, as equity dictates." The equitable findings were issued in the trial court's initial and second fact findings. *Cf. Wiese*, 2015 WL 1061553, at *4 (partition suit involving piecemeal issuance of fact findings that were analyzed collectively in evidentiary sufficiency challenge).

In the initial January 2017 finding, the trial court found that Molly was "entitled on the equities to the portion of the property containing the home and boat dock." In its later findings, the trial court found that the house had "no determined market value" but did have "sentimental value to Molly" and her children. Further, the trial court found that Molly paid for the boat dock without contribution from Tibaut or Powers. Molly provided evidence that she used and maintained the boat house and lake house. The trial court found that Molly raised equitable considerations for receiving the portion of the property that contained the house and boat dock because she wanted to use the property while her brothers want to sell their portion.

Immediately following these findings, the trial court found and concluded:

[Finding 17]  Recognizing that Texas law favors partition in kind, and that the party seeking partition-by-sale bears the burden of proving that a partition in kind would not be fair or equitable, the Court finds that the Bowman Lake Place is susceptible to fair and equitable partition in kind.[11]

---

[11]  We note that nothing in the trial court's judgment and findings required the commissioners to divide the property into three equally-*sized* parcels. Instead, they

34

| [Finding 18] | Partitioning the Bowman Lake Place in kind would not materially impair its value. |
|---|---|

. . .

| [Finding 20] | Forcing Molly Bowman Stephens to sell her undivided interest in the Bowman Lake Place would not be reasonable, fair, or equitable. |
|---|---|
| [Conclusion 9] | . . . The Court acknowledges that the general rule is that when one party makes or pays for improvements, the improved portion will be allotted to that person. [citation omitted] The Court finds no reason to stray from this long-established rule under the facts and equities of this case. |
| [Conclusion 10] | . . . Molly Bowman Stephens was the only party to plead and to offer proof to this Court that she paid for certain improvements and other equitable consideration . . . . |

Combined, these findings and conclusions instructed the commissioners that the trial court had determined that equity required that Molly be allotted the portion of the property containing the house and boat dock—the former having sentimental value but no market value, and the latter having been constructed with Molly's funds and without any contribution from her brothers. The argument by Tibaut and

---

were to divide the property into three equally-*valued* parcels, such that Molly would be allotted the parcel that contained the house and boat dock. That Dunn divided the property into 3 equally-*sized* parcels was not binding on the commissioners.

Powers that the trial court did not make such an equitable finding is contrary to the record.[12]

Having rejected both premises underlying Tibaut and Powers's argument that the trial court exceeded its authority in its findings, we overrule their second issue.

## D. Whether there is sufficient evidence to support the trial court's findings and conclusion

In their third and final issue, Tibaut and Powers contend that there is insufficient evidence to support seven of the trial court's findings. We consider each.

The first finding was that the "back 85-acre tract is essentially undevelopable." They assert that their expert, Ezell, said that the highest and best use for the property as a whole was as a private lakefront estate and that the evidence did not support a requirement that the 85 acres be developed. Further, other areas within the Balcones Canyonland Preserve had been developed. Neither point is inconsistent with the trial court's finding. Moreover, multiple witnesses

---

[12] The brothers argue that the commissioners have, since the first judgment was issued, acted inconsistent with the finding that Molly, in equity, should receive the portion of property upon partition that includes the house and boat dock. To the extent the commissioners might act contrary to the trial court's instructions, the Rules of Civil Procedure provide a basis for the trial court to reject the commissioners' report. *See* TEX. R. CIV. P. 771 ("If the report be found to be erroneous in any material respect, or unequal and unjust, the same shall be rejected, and other commissioners shall be appointed by the Court, and the same proceedings had as in the first instance."). This issue is not before us at this proceeding stage.

testified that the upper 85 acres was undeveloped, had a "steep slope" greater than 15% for over half the property, had "difficulty in access," was "significantly limited" in possible uses due to the natural physical characteristics, and was "unbuildable" as a result of those characteristics. This evidence provides legally and factually sufficient evidence to support the challenged finding.

The next finding was that the neighbor historically had permitted and continued to permit access to Lake Pace but there was "no written or recorded easement" describing the scope or extent of these claimed access rights. All siblings testified that the neighbor permitted access. Irion referred to the access as a prescriptive easement, but his testimony was no evidence of an easement given his later testimony that the document he had analyzed contained a mere inference of an easement, which he did not otherwise verify. Additionally, there was evidence that Tibaut wrote to his siblings prelitigation to discuss their need for a written easement, thereby implying that none existed. There is legally and factually sufficient evidence to support the challenged finding.

Next, the trial court found that there was "uncertainty of access" across the neighbor's land that would "likely reduce the price that a buyer would pay for all or any part of the property." Again, this finding is consistent with the testimony. Powers testified that access had "been a concern" for the family. He also testified that the "only potential purchaser in the world who would not have a problem with

access" was the owner of the neighboring land who already had direct access to public roads. And Tibaut wrote prelitigation that there was "no deeded easement access" for Lake Place. There is legally and factually sufficient evidence to support the challenged finding.

The next finding was that the neighbor who allowed access was the best and most likely buyer capable of maximizing the property's value because that buyer would not have an access issue. As mentioned earlier, Powers's own testimony provides adequate evidence for this finding.

The next challenged finding was that Moreland, on Tibaut's behalf, received only two offers to purchase the property during an eight-year period. The offers were for $8 million and $12.7 million. Testimony from Moreland and Powers support this finding. Each testified about these two offers and no others. Moreland discussed conversations he had had with people who might have made an offer, but he testified they had not. Thus, there is legally and factually sufficient evidence to support this challenged finding.

The next challenged finding was that the area referred to as Lot 3—which all parties agree was the portion of the property with the boat dock—"contains a boat dock which was built and paid for by [Molly] without contribution from" Powers or Tibaut. The brothers challenge this finding because there was evidence Molly did not seek contribution. That evidence is not contrary to the finding that Molly

38

paid for the boat dock without contribution from them. There is legally and factually sufficient evidence to support this challenged finding.

The final challenged finding was that the brothers "failed to plead or offer any evidence at trial that they paid for any improvements and also failed to offer any evidence of other equitable considerations."

One of the themes of the brothers' appellate briefing is that "the findings and conclusions entered by the trial court appear to decide equitable issues that should have been saved for the second trial" and wrongly prevent them "from raising equitable issues as to any proposed division in the second phase of this partition proceeding." But the case law dictates that equitable considerations were to be determined in the suit's first stage, not the second. *See* TEX. R. CIV. P. 761; *Yturria*, 921 S.W.2d at 341–42; *Bolinger*, 2015 WL 9473924, at *2; *see also Hoyt*, 2011 WL 5999866, at *3; *Price*, 394 S.W.2d at 858; *Bouquet*, 376 S.W.2d at 362–63. To the extent Tibaut and Powers had equity-based evidence they elected to hold until the litigation's second stage, that possibility does not render the trial court's finding incorrect.

Finally, we note that, to the extent the brothers' testimony about their handling of financial and government-filing matters could be viewed as supporting an equitable claim, their evidence was off-set by other evidence of discrepancies in government filings, lapses in insurance due to nonpayment, and unpaid taxes.

39

Molly testified that the handling of these matters by her brothers "put our families in tremendous risk," calling into question any benefit from their endeavors. The trial court weighed the equities in this partition suit. There was legally and factually sufficient evidence to support the trial court's equitable determinations.

Having concluded there was sufficient evidentiary support for the challenged findings, we overrule the third issue.

## Conclusion

We affirm.

<div style="margin-left: 40%;">

Harvey Brown
Justice

</div>

Panel consists of Justices Higley, Brown, and Caughey.