**AFFIRMED and Opinion Filed March 4, 2021**



**In The**
**Court of Appeals**
**Fifth District of Texas at Dallas**

**No. 05-19-01303-CV**

**IN THE MATTER OF THE MARRIAGE OF A.W.E. AND D.M.F.N.**

**On Appeal from the 254th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. DF-18-11265**

## MEMORANDUM OPINION

Before Justices Myers, Osborne, and Carlyle
Opinion by Justice Myers

A.W.E. (Wife) appeals the property division in the trial court's decree of divorce of her marriage with D.M.F.N. (Husband). Wife brings five issues contending the trial court abused its discretion by (1) ordering that one of the community assets, their interest in their companies, be sold to the highest bidder; (2) awarding Husband more of the brokerage accounts than were awarded to Wife; (3) awarding Husband a ranch that was community property without awarding Wife half of the community funds used during the marriage to improve the ranch; (4) dividing an investment equally between the parties when Wife had paid for the investment from her line of credit; and (5) ordering Wife, and not Husband, to pay the attorney's

fees of their companies incurred after Wife brought the companies into the divorce litigation. Husband moves for dismissal of the appeal, asserting that Wife's appeal is barred because she accepted some of the benefits of the divorce decree. We deny Husband's motion to dismiss the appeal, and we affirm the trial court's judgment.

## BACKGROUND

After Husband got out of college, he started a real estate company, Clifford Fischer & Company (the company).[1] Wife came to work at the company, and they married in 1986. They worked successfully to build up the business, and they built a substantial community estate. Before 2008, the company was Husband's separate property. In 2008, he and Wife signed a post-nuptial agreement (PNA) that converted Husband's interest in the company from separate to community property. As a result of the PNA, Husband and Wife each held fifty percent of the company's shares.

Much of the company's success was due to the work of four key employees: Jeff Kernochan, Larry Teel, Ted Uzelac, and Chris Joyner. In the 1990s and early 2000s, while the company was still Husband's separate property, Husband entered into oral and informal written agreements on behalf of the company with these key employees to pay them annual bonuses that together totaled twenty-five percent of the company's net cash profits each year. He also promised that if a majority of the

---

[1] Over the years, subsidiary companies were created, including Fischer Solutions, Inc., Fischer Pennsylvania, Inc., Fischer Management Services, Inc., and Fischer Pacific, Inc. Unless otherwise specified, references to "the company" include these subsidiaries.

stock were to pass to someone other than him, Wife, or their descendants, then the key employees would receive change-of-control bonuses totaling twenty-five percent of the net cash proceeds for the company.

The PNA also contained provisions concerning the division and valuation of the parties' community estate if they got divorced. The PNA provided they would each be "allocated or awarded assets and liabilities totaling fifty percent of the net value of the community." The agreement stated that the "net value of the community estate" would be "determined by totaling the fair market value of all assets and subtracting the total of all community liabilities then outstanding." The PNA stated that if they could not agree on the value of an asset, then they would each have it valued by an appraiser. If the appraisals were within ten percent of each other, then the two appraised values would be averaged. If the two appraisals were more than ten percent apart, then the appraisers would choose a third appraiser, whose appraisal would be averaged with the appraisal closest in value, "and the resulting value shall be used as the fair market value."

The parties separated on July 6, 2017. On May 31, 2018, Wife filed suit for divorce. The parties could not agree on the fair market value of the company, and they hired appraisers to determine the value of the company as of December 31, 2018. The appraisers delivered their appraisals on February 6, 2019. Wife's appraiser, Aurora Kraus, appraised the company at $72,280,000. Husband's appraiser, Bryan Rice, appraised the company at $30,494,700. Because these two

appraisals differed by more than ten percent, the appraisers brought in a third appraiser, Thomas Hope, who issued his report on April 15, 2019, appraising the company at $50,522,000.[2] None of the appraisals considered the effect of the change-of-control bonuses or capital gains tax if the spouse awarded the company were to sell it.

Pursuant to the PNA, the appraisal closer to Hope's appraisal would be averaged with Hope's appraisal to determine the company's fair market value. Hope's appraisal was closer to Rice's appraisal than Kraus's, and the average of Rice and Hope's appraisals was $40,508,350. Considering only those appraisals, the fair market value of the company determined under the procedure set forth in the PNA was $40,508,350.

However, that was not the last of the appraisals. On May 20, 2019, after Hope had published his appraisal, Kraus revised her appraisal, reducing her appraised value to $65,840,000. This revision brought Kraus's appraisal closer to Hope's than Rice's. If Kraus's revised appraisal were averaged with Hope's appraisal, then the fair market value of the company would be $58,181,000, an increase in value of almost $18 million by using Kraus's appraisal instead of Rice's. Husband moved to exclude Kraus's revised appraisal from consideration, but the trial court denied the motion.

---

[2] All three appraisals were made without knowledge of the results of the other appraisals. The appraisers described the process as "blind" or "independent."

–4–

During the trial, the parties presented evidence on the valuation of the company, the methodology of the appraisals, and the value of other assets. Husband asked that the trial court order the company be sold because the time was right to sell the company. Wife testified that she did not want to be awarded the company, but she did not want the company sold if a court-ordered sale would result in a reduced price. Wife asked that the company be awarded to Husband and valued at the average of the Hope and revised Kraus appraisals, i.e., $58,181,000, and that she be awarded the equivalent amount of the community estate in other property. Husband testified he would agree to being awarded the company if it were valued at $20 million or less.

Besides the litigation concerning the business, the parties also agreed during the trial to the sale of their residences, which neither of them wanted to receive in the property division. The properties were to be listed with a particular realtor, sold for a price mutually agreeable to Husband and Wife, and the net proceeds from the sales divided between the parties.

After the trial, the court sent the parties a memorandum of rendition of judgment. The court stated that it divided the community estate equally. The court awarded each spouse one half of the stock in the company and ordered that the company be sold. The memorandum set forth the procedure for selling the company, provided for the payment of the expenses of the sale, the payment of the change-of-control bonuses to the key employees, the payment of any capital gains tax, and

–5–

stated that the remainder was to be paid in equal amounts to the parties. The court later signed the divorce decree, which followed the memorandum of rendition.

## MOTION TO DISMISS

Husband moves to dismiss this appeal because Wife accepted the benefits of the divorce decree and is therefore estopped from attacking the decree. Husband contends Wife accepted the benefits of the decree when she (1) brought a motion to enforce the decree and sought to hold Husband in contempt of court for misusing funds in an account designated for expenses of the parties' residences; (2) took possession of furnishings awarded to her in the divorce decree; and (3) invoked the divorce decree and the post-divorce separate-property nature of her interest in the company when she asserted that a shareholder voting agreement was no longer valid.

The supreme court most recently described the acceptance-of-benefits doctrine in a divorce case in *Kramer v. Kastleman*, 508 S.W.3d 211 (Tex. 2017):

> Litigants cannot enjoy the fruits of a judgment while simultaneously challenging its validity. . . . The acceptance-of-benefits doctrine is based on the principle of estoppel and precludes a party from first adopting a judgment as right, and then repudiating it as wrong, so as to take advantage of its being both right and wrong. Estoppel prevents litigants from taking contradictory positions as a means of gaining an unfair advantage from the inconsistency. Courts, we have said, should not be placed in the attitude of subserving such a purpose; nor would it be fair dealing towards the opposite party to permit it.
>
> The acceptance-of-benefits doctrine is thus anchored in equity and bars an appeal if the appellant voluntarily accepts the judgment's benefits and the opposing party is thereby disadvantaged. The burden of proving an estoppel rests on the party asserting it, and the failure to prove all essential elements is fatal.

. . . . The doctrine's equitable objective of precluding an appeal when a litigant's actions are inconsistent with a claim of error furthers finality, preserves scarce judicial resources, and guards against gamesmanship.

*Id.* at 217–18 (footnotes and internal punctuation omitted).

"[T]he existence of prejudice plays a fundamental role in determining whether it would be unconscionable and inequitable to permit an appeal to move forward, particularly in divorce cases . . . ." *Id.* at 219. In determining prejudice to one spouse from the other spouse's acceptance of benefits under the divorce decree, courts consider whether the benefits the spouse accepted, or the proceeds from their sale, remain available for redistribution, or whether they have been so dissipated, wasted, or otherwise converted that they cannot be recovered. *Id.* at 222. Dismissal under the acceptance-of-benefits doctrine is not favored; "an adjudication on the merits is preferred in Texas." *Id.* at 227 (internal punctuation omitted).

Thus, we must determine whether Wife's actions are inconsistent with her claims of error on appeal and whether Husband established the prejudice necessary to deny Wife a merits-based disposition of her appeal. *See id.* at 232 ("We hold that a merits-based disposition must not be denied absent disadvantage to the opposing party and circumstances reflecting clear intent to acquiesce in the judgment's validity.").

Husband argues Wife accepted the benefits of the divorce decree when she filed her motion seeking an order that Husband be held in contempt of court and ordered to reimburse an account. In the divorce decree, the court permitted the

parties to access a joint bank account to be used exclusively for the expenses of their residences pending the sale of the residences. Wife alleged in the motion that Husband had violated this provision by withdrawing funds from the account and using them for travel, business expenses, and other spending not related to the residence. Wife asked the court to hold Husband in contempt and to require him to reimburse the account in the amount of his improper withdrawals. This motion does not concern any of the issues relevant to this appeal, and the motion is not inconsistent with any of Wife's claims of error on appeal. Nor does Husband explain how the motion prejudiced him by making property unavailable for redistribution should the appeal result in the case being remanded to the trial court. We conclude Wife's motion is not the sort of acceptance of benefits that should deny her a merits-based disposition of this appeal.

Husband also argues the appeal should be dismissed because Wife "took furniture, some of which was awarded to her under the decree." The divorce decree provided that Wife's residence was to be sold with its furnishings. Any personal property (other than clothing) formerly located in Wife's residence but that was no longer there was to be sold at auction. The court ordered the parties not to remove any property from Wife's residence without the approval of the realtor. Husband alleged Wife removed furnishings from her residence without his knowledge and without the realtor's approval. None of the issues in this appeal concern the furnishings in Wife's residence. Nor does Husband explain how Wife's taking

possession of the furnishings prejudiced him. He does not assert that the furnishings or their proceeds are not available for redistribution. We conclude Husband has not shown the appeal should be dismissed because Wife took possession of furniture.

Finally, Husband argues the appeal should be dismissed because of Wife's action at a shareholders' meeting of the company. When Husband and Wife signed the PNA, which made the company's stock community property instead of his separate property, they also signed a voting agreement. The voting agreement provided that if they disagreed on an issue requiring the majority vote of the shareholders, then an executive of the company could cast the deciding vote. In 2019, that executive was Larry Teel. The voting agreement provided it would remain in effect so long as Husband and Wife owned the company's stock "as their community property." At a shareholders' meeting in December 2019, which was held to approve proposed changes to the company's articles of incorporation and bylaws, it became apparent that Husband and Wife did not agree on the changes. Wife objected to Teel casting the deciding vote. She asserted that because the divorce decree awarded them each fifty percent of the company as their separate property, they no longer owned the stock "as their community property," the voting agreement was no longer in effect, and Teel had no authority to vote in the shareholders' meeting. Husband argues the appeal should be dismissed because of Wife's reliance on the decree in her assertion that the voting agreement was no longer in effect. We disagree. "[M]erely using, holding, controlling, or securing

possession of community property awarded in a divorce decree does not constitute clear intent to acquiesce in the judgment and will not preclude an appeal absent prejudice to the nonappealing party." *Id.* at 228. Wife's refusal to approve the amendments was the use of the shares, the exercise of her rights as a shareholder, and will not preclude her appeal absent a showing of prejudice by Husband.

The prejudice Husband asserts is that the articles of incorporation and bylaws refer to repealed statutes, not current law. He states that the "antiquated provisions deter the Company from seeking qualified, experienced candidates to serve as officers and/or directors of the company, which in turn negatively affects the Company's ability to compete in the market." He also states that some of the Company's officers have sought the amendments and that Wife's refusal to vote for the amendments "threatens to push these seasoned officers to seek employment elsewhere, which would negatively impact the Company's success as a business and affect the scalability of the Company and the value of [Husband's] interest in the company." None of these assertions is supported by the record. The record does not show what specific amendments were sought, nor is there any evidence that a potential officer or director would refuse a position with the company because the articles of incorporation and the bylaws refer to the old statutes. Nor is there any evidence that any current officer would leave due to the out-of-date corporate documents. Instead, the record from the trial, held about six months before the shareholders' meeting, shows that none of the key employees still at the company

had any plans to leave the company. Furthermore, the potential, but unproven, drop in the company's value, standing alone, is not the sort of prejudice recognized in *Kramer*. Husband has not shown how Wife's refusal to vote for the amendments and her assertion that the voting agreement had expired interfere with the distribution of property and any possible redistribution in the event of a remand. *See id.* at 228–29.

Husband's loss of any control he may have had over the voting of the shares is not the sort of irremediable prejudice necessary to support dismissal of the appeal. The appeal does not concern the voting of the company's shares. In *Kramer*, the husband argued that the award to the wife of partnership interests that were community property and her making decisions affecting the partnerships when the husband had previously controlled them constituted irremediable prejudice because he could not exercise the rights of a general partner during any period the wife controlled the assets. The supreme court did not find the husband's argument persuasive. *See id.* at 230. Likewise, Husband's loss of any control over the outcome of a voting dispute is not the sort of prejudice warranting dismissal of the issues Wife brings on appeal.

We conclude Husband has not shown the appeal should be dismissed due to Wife's acceptance of benefits under the divorce decree. We deny Husband's motion to dismiss the appeal.

**STANDARD OF REVIEW OF PROPERTY DIVISION**

Wife's first through fourth issues assert the trial court erred in the division of the community property between the parties.

In a divorce decree, "the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." TEX. FAM. CODE ANN. § 7.001. Citing Black's Law Dictionary, the supreme court has defined "just" as meaning "legally right; lawful; equitable"; "right" as meaning "that which is proper under law, morality, or ethics"; and "due regard" as meaning "the attention, care, or consideration that is just, proper, regular, and reasonable." *Bradshaw v. Bradshaw*, 555 S.W.3d 539, 543 (Tex. 2018) (footnotes and internal punctuation omitted). "In the end, the court is to do complete equity as between the husband and wife and the children, having due regard to all obligations of the spouses and to the probable future necessities of all concerned." *Id.*

When exercising its broad discretion to divide the marital property, the trial court may consider many factors, including the nature of the marital property, the relative earning capacity and business opportunities of the parties, the parties' relative financial condition and obligations, the parties' education, the size of the separate estates, the age, health, and physical conditions of the parties, fault in breaking up the marriage, the benefit the innocent spouse would have received had the marriage continued, and the probable need for future support. *See Murff v. Murff*,

615 S.W.2d 696, 699 (Tex. 1981); *In re Marriage of C.A.S. & D.P.S.*, 405 S.W.3d 373, 384 (Tex. App.—Dallas 2013, no pet.).

We review the trial court's division of a community estate for an abuse of discretion. *Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.—Dallas 2005, pet. denied). A trial court does not abuse its discretion if there is some evidence of a substantive and probative character to support the decision. *LaFrensen v. LaFrensen*, 106 S.W.3d 876, 877 (Tex. App.—Dallas 2003, no pet.).

In family law cases, the abuse of discretion standard of review overlaps with the traditional sufficiency standards of review; as a result, legal and factual sufficiency are not independent grounds of reversible error, but instead constitute factors relevant to our assessment of whether the trial court abused its discretion. *Moroch,* 174 S.W.3d at 857. To determine whether the trial court abused its discretion we consider whether the trial court (1) had sufficient evidence on which to exercise its discretion and (2) erred in its exercise of that discretion. *In re A.B.P.*, 291 S.W.3d 91, 95 (Tex. App.—Dallas 2009, no pet.). We then proceed to determine whether, based on the elicited evidence, the trial court made a reasonable decision. *Id.*

In an appeal from a bench trial, an appellate court reviews a trial court's conclusions of law de novo and will uphold them on appeal if the judgment of divorce can be sustained on any legal theory supported by the evidence. *Reisler v. Reisler*, 439 S.W.3d 615, 619 (Tex. App.—Dallas 2014, no pet). We "may not

challenge a trial court's conclusions of law for factual sufficiency, but . . . may review the legal conclusions drawn from the facts to determine their correctness." *Id.* If we determine that a conclusion of law is erroneous, but the trial court nevertheless rendered the proper judgment, the error does not require reversal. *Id.* at 619–20.

When the appellate record contains a complete reporter's record, we review the trial court's findings of fact under the same standards for legal and factual sufficiency that govern the review of jury findings. *Id.* at 620. In evaluating a legal sufficiency challenge, we credit evidence that supports the finding if a reasonable fact finder could, and disregard contrary evidence unless a reasonable fact finder could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). The test for legal sufficiency is whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* In a factual sufficiency review, we examine all the evidence in the record, both supporting and contrary to the trial court's finding, and reverse only if the finding is so against the great weight of the evidence as to be clearly wrong and unjust. *In re Marriage of C.A.S. & D.P.S.*, 405 S.W.3d 373, 382–83 (Tex. App.—Dallas 2013, no pet.).

In this case, the parties had an agreement to divide the marital estate equally. The trial court intended to honor that agreement, and the court's division of the community property purports to equally divide this $90 million community estate—

–14–

not including the value of the company and some mineral interests—down to the penny.

## SALE OF THE COMPANY

In her first issue, Wife contends the trial court erred by ordering the company be sold and the net revenues divided equally between the parties.

Wife first points out that the PNA does not provide for the sale of the community property. The PNA provides that if the parties get divorced, the community estate will be equally divided between them with each spouse receiving assets and liabilities totaling fifty percent of the net value of the community estate. "The net value of the community estate shall be determined by totaling the fair market value of all assets of the community estate and subtracting the total of all community liabilities then outstanding." If the parties are unable to agree on the fair market value of community property, then they will jointly engage an appraiser. If they cannot agree on an appraiser, then they will each select an appraiser. If the two appraisers' values are within ten percent of one another, then the fair market value is the average of the two appraised values. However, if the values are more than ten percent apart, then the two appraisers select a third appraiser. Then, the third appraiser's value is averaged with whichever of the other two appraisers' values is closer, and that averaged value would be the fair market value for the property.

Although the PNA did not authorize the sale of any of the property as a means to determine value or to distribute the community estate, the parties agreed to sell

and divide the net proceeds for property that neither of them wished to receive in the divorce, most notably, two of their residences. One was a $10 million house, and the other was a $4 million condominium. The court ordered those properties be sold and for the net proceeds to be divided equally between them.

The divorce in this case was pending in the trial court for a little over a year before trial. Early in the proceeding, Husband was opposed to the sale of the business. But by the time of trial, he thought selling the business was the best plan for him and Wife and the key employees to be able to reap the benefit of their longtime work in the business. He testified that he and the other key employees were close to retirement age, and that a purchaser of the company would want them to stay on for a few years to assist in the transition to the new ownership. So the time was right to sell the company.

The testimony about the appraisals also showed they were fraught with inconsistencies. Four of the inconsistencies were what data to use, what size businesses to compare to the company, how to account for and remove the spouses' personal goodwill from the valuations, and how to account for $5.8 million of profits from 2018. Evidence also showed that regardless of the appraisers' determination of fair market value, the actual price a purchaser would pay for the company followed a different formula.

The appraisers were to determine the fair market value of the company as of December 31, 2018. The question then arose of whether to determine the value of

the company and the other business used to compare to the company based on the information available on December 31, 2018, or to include data that became available after December 31, 2018. Kraus and Rice used only information that was available on December 31, 2018. Hope, who delivered his appraisal about 3 months after Kraus and Rice, used data that did not become available until after December 31, 2018, but that was relevant to determining the company's value on December 31, 2018. Kraus then amended her appraisal to use the later-available information, which reduced her valuation by $6,440,000, about nine percent.

The appraisers also disagreed about the size of the businesses to use to compare to the company. The company's revenues were historically $47 million to $62 million per year. Kraus and Hope compared the company to multinational businesses with revenues in the hundreds of millions to billions of dollars. Rice compared the company to smaller businesses and explained that smaller businesses had risks affecting their valuations that did not exist to the same extent in the larger businesses Hope and Kraus used to compare to the business.[3] Hope and Kraus testified that their valuations followed acceptable protocols.

The appraisers also disagreed on how to discount personal goodwill. In Texas, the personal goodwill of a spouse in a business is not an asset of the community estate subject to division in a divorce. *See Nail v. Nail*, 486 S.W.2d 761, 763–64

---

[3] One of the company's risks was that about half of its revenues came from one client. In 2019, that client deferred many of its real estate projects, which resulted in reduced revenues for the company.

(Tex. 1972); *Finn v. Finn*, 658 S.W.2d 735, 741–42 (Tex. App.—Dallas, 1983, writ ref'd n.r.e.) (en banc). Thus, the question was how much of the company's value was attributable to Husband and Wife's personal goodwill. Rice determined that it was fifty percent of the company's intangible value, Kraus determined it was twenty-five percent of the intangible value, and Hope, who had not previously done a business valuation for a divorce in Texas, determined it was zero percent.[4] Rice determined the personal goodwill attributable to Husband and Wife was $12.8 million. Kraus determined the personal goodwill attributable to the parties was $22.9 million. If Kraus, like Rice, had determined the personal goodwill was 50 percent of the intangible value instead of twenty-five percent, then her appraisal would presumably have been substantially reduced. If Hope, like Kraus, had determined the parties' personal goodwill was twenty-five percent of the intangible value, then his appraisal would have been about $8.4 million less, and if he had agreed with Rice and determined the parties' personal goodwill was fifty percent of the intangible value, then it would have reduced his appraisal by $13.9 million.

The other inconsistency was the accounting for the $5.8 million of distributable profits in the company from 2018. These profits were due to be distributed to Husband and Wife but were still on the company's books on December

---

[4] Hope testified that Husband and Wife's personal goodwill was paid to them in the form of their compensation and payment of the profits from the business, so none of its value remained in the company. Kraus and Rice, who had performed many business valuations for divorces in Texas, testified they did not understand Hope's explanation.

31, 2018. Kraus and Rice included the funds in their determinations of the company's value, but Hope did not.

Each of these inconsistencies amounted to differences of several million to over ten million dollars of appraised value in the company.

The trial court also heard evidence that the appraised values were not the amount a purchaser would pay for the company. Witnesses testified that businesses that would be interested in purchasing the company would pay three to three-and-a-half times EBITDA, earnings before interests, taxes, depreciation, and amortization. The company's EBITDA had been falling over the last few years. In 2017, EBITDA was $11.9 million; in 2018, it was $8.9 million, and in 2019, based on the first part of the year, it was projected to be $6 million. Using the 2018 EBITDA, that would make the sales price $26.7 million to $31.15 million, well below Kraus's and Hope's appraised values. And if the sales price were based on the 2019 projected EBITDA of $6 million, the sales price would be $18 million to $21 million.

The trial court also heard evidence about the effect of the change-of-control bonuses and capital gains tax on the amount a spouse would receive from the sale of the company. Husband presented evidence that if the company sold for $40,508,350 (Rice's valuation averaged with Hope's), then the net proceeds reduced by the change-of-control bonuses and capital gains tax would be $23,342,963.58, a reduction of over $17 million, and if the sale price were $58,181,000 (Kraus's revised valuation averaged with Hope's), then the net proceeds reduced by the

bonuses and tax would be $33,319,174.50, a reduction of over $25 million. These reductions amount to about forty-two percent of the company's value. And those calculations do not include any of the other potential costs associated with the sale of the company.

Neither party wanted to keep the company if it were awarded to that spouse. The court could conclude from the evidence that if the company were awarded to one spouse for the appraised amounts according to the PNA, there was a likelihood that spouse would sell the company and receive, at most, only fifty-eight percent of the appraised amount, while the other spouse would receive the entire appraised amount in other community property or in a promissory note secured by the community property awarded to the spouse receiving the company. There was also the possibility that the company's sale price before the reductions for the change-of-control bonuses and capital gains tax might be significantly less than the appraised value. The court could conclude that such a result would not be in keeping with the clear intent expressed in the PNA to divide the community estate equally nor result in a just and right division of the community estate as required by section 7.001 of the Family Code.

The court's memorandum of rendition of judgment demonstrates the court's difficulty in determining the fair market value of the company:

> The issue that has been most problematic is the Fischer companies themselves. Recognizing that there is an enormous disparity in value I have determined that these companies should be sold. The arguments

> cited by Mrs. Fischer are serious[;] however neither party should be awarded an asset that requires them to work if they choose not to do so.

The memorandum of rendition of judgment, and subsequently the divorce decree set out the procedure for selling the company.

Wife argues on appeal that Husband was estopped from asserting the company should be sold because that position was contrary to an earlier position Husband had taken in the litigation. "Estoppel prevents litigants from taking contradictory positions as a means of gaining an unfair advantage from the inconsistency." *Kramer*, 508 S.W.3d at 217 (Tex. 2017). Wife asserts Husband had made statements during the litigation that the court was bound by the valuation procedures in the PNA. In particular, Wife cites to statements in Husband's "Brief That the Court is Bound by the Terms Set Out Within the Four Corners of the Post-Nuptial Agreement." That brief argued the trial court could not consider Kraus's revised appraisal of the company because, he argued, the valuation could be determined only from the original appraisals of each spouse's appraiser and the third appraiser. The brief did not address whether the trial court could order the company be sold and the proceeds divided between the parties.[5] The brief was not contrary to Husband's position that the company should be sold. The sale of the company with distribution

---

[5] The record does not show that the parties scrupulously followed the three-appraiser procedure. Husband's inventory included the value he put on the community property and the value Wife put on the property. That exhibit shows the spouses disagreed about the value of several vehicles by more than ten percent, yet the record does not show they followed the three-appraiser procedure to resolve the differences. Instead, it appears they allowed the trial court to exercise discretion to determine the value.

–21–

of the net proceeds was an alternative form of relief versus awarding the company to one spouse based on valuation under the PNA's three-appraiser procedure. It was not a contradictory position. Therefore, Wife has failed to show Husband was estopped from requesting the sale of the company.

Wife asserts the PNA did not provide for the sale of any of the community assets to determine their value. Wife is correct; the PNA did not expressly provide for the sale of community assets. Nor did it expressly prohibit it. The PNA was silent on the subject. However, the parties obviously did not believe the PNA prohibited the sale of community assets and the division of the proceeds as part of the property-division procedure because they agreed that the court could order the sale of their residences and furnishings with the net proceeds from the sales divided between the parties. The trial court could presume this was the procedure for assets that neither spouse wanted to receive in the property distribution. Wife testified she did not want to be awarded the company, and she "would agree to buy the company" for one dollar. However, she testified she thought the company was worth more than $100 million and should be awarded to Husband even if he did not want it. Her proposed division of property requested that the court award the company to Husband and value it in the property distribution at over $59 million. Husband testified he did not want the company unless it was valued at $20 million or less. The trial court could conclude from this evidence that, like the residences, neither

party wanted to receive the company in the property distribution and that it should be sold, dividing the net proceeds between the parties.

Wife argues on appeal that the law does not permit a court to order the sale of the company.[6] Quoting an opinion from the Texarkana Court of Appeals, Wife asserts, "'[t]he right to have property partitioned in kind is a valuable right,' and '[t]he law does not favor compelling an owner to sell his property against his will, but prefers a division in kind when such can be fairly and equitably made.'" *Rayson v. Johns*, 524 S.W.2d 380, 382 (Tex. App.—Texarkana 1975, writ ref'd n.r.e.). *Rayson* stands for the proposition that where there is a fact question about whether real property can be divided in kind, a party is entitled to a jury determination of that issue when a jury has been properly requested. *See id.* at 382–83. The case did not involve division of property in a divorce, nor did it concern division of business interests. To the extent the opinion is applicable, it stands for the position that the trier of fact may determine that property should be sold instead of divided in kind when the division cannot "be fairly and equitably made." *Id.* at 382. In this case, Wife did not seek to have the company divided; she wanted the company awarded entirely to Husband with other community property equal to the value of the company awarded to her. Moreover, there was evidence that awarding the company to one spouse would potentially be unfair and inequitable given the large differences

---

[6] Wife did not present this argument in the trial court. There, she argued that the trial court had authority to order the company be sold but that the court should not do so.

in the appraisals of the property, the effect of the change-of-control bonuses and capital gains tax, and the fact that neither spouse wanted to be awarded the property.

Wife also cites *Braswell v. Braswell*, 476 S.W.2d 444, 447 (Tex. App.—Waco 1972, writ dism'd w.o.j.). In that divorce case, the spouses owned as community property all but 38 shares of the 35,000 issued shares in a closely held corporation. The remaining 38 shares were held by an employee of the company. *Id.* at 445. In that case, the husband managed the company. *Id.* at 447. The wife wanted their interest in the company sold, but the husband did not. *Id.* The court assumed that the husband would control a majority of the shares because the employee holding the 38 shares would vote with him. *Id.* The trial court divided the community shares between the spouses, and the court of appeals affirmed. *Id.* The court of appeals stated, "the mere fact that stock in a closely-held corporation is divided in kind between the husband and wife in such a way that the husband, who is president and general manager of the corporation, might retain the control of the corporation does not, alone, constitute an inequitable division." *Id.* at 448. That is not our situation. First, the husband in *Braswell* wanted to keep control of the company. *Id.* at 447 (the wife argued the husband refused to sell the company and "possesses the control to operate it for his own benefit"). In the case before us, neither spouse wants to continue to own the business. Also, in *Braswell*, despite the wife's assertion that she would be unable to liquidate her minority position, the court of appeals assumed she would be able to liquidate her interest if she decided to do so. *Id.* The court of

appeals determined, in that situation, that it was not an abuse of discretion for the court to refuse to order the sale of the shares and to divide the shares equally between the parties. *Id.* In this case, Wife is not complaining that she cannot sell her shares, nor is she asking that the shares be divided equally between the parties and not be sold. Instead, she is asking that Husband essentially be required to purchase her shares in the company when Husband does not desire to do so. That was not the situation in *Braswell*, and *Braswell* is not helpful in determining whether the court may order the sale of the shares in this case.

Wife also cites *Bowman v. Stephens*, 569 S.W.3d 210 (Tex. App.—Houston [1st Dist.] 2018, no pet.). That case involved a dispute among siblings concerning lakefront property. The two brothers wanted to sell the property; the sister did not want to sell but wanted the property partitioned so she could keep a portion of the property and the brothers could sell their portions. *Id.* at 215–16. The brothers sued their sister seeking a judgment requiring the sale of the property and division of the sale proceeds. *Id.* at 216. The trial court determined that partition in kind was possible. The brothers appealed that determination, *id.* at 224–27, and the court of appeals concluded the trial court did not abuse its discretion in determining the property could be partitioned in kind. *Id.* at 227–28. Wife quotes the court of appeals' statements that "Texas law favors partition in kind over partition by sale," *id.* at 220, and "[t]he party seeking to obtain a partition by sale (instead of the legally favored partition in kind) has the burden to demonstrate that partition in kind is

–25–

impractical or unfair." *Id.* at 220 (internal quotation marks omitted). In this case, neither party seeks partition in kind of the company's stock. Husband wants partition by sale of the stock, and Wife wants the trial court to order Husband to buy her interest at a price that does not account for the change-of-control bonuses and the capital gains tax. The evidence showed, and the trial court commented in the memorandum of rendition of judgment, that there was "an enormous disparity in value" concerning the company that supported selling the company and that "neither party should be awarded an asset that requires them to work if they chose not to do so." Because this case does not involve a choice between partition in kind or partition by sale, *Bowman* is not helpful.

Wife also cites *Beavers v. Beavers*, 675 S.W.2d 296 (Tex. App.—Dallas 1984, no writ). In that divorce case, the community owned a one-third interest in a closely held corporation. The trial court awarded the stock to the husband and awarded the wife a judgment against the husband. *Id.* at 299. We observed that "[n]either party complained of this approach." *Id.* In the case before us, however, Husband did complain of an approach that would have awarded him all the shares and awarded Wife other community property or a promissory note secured by community property awarded to Husband. Therefore, *Beavers* is not applicable to the case before us.

Quoting a brief she filed in the trial court, Wife states, "Texas law favors dividing marital assets between the spouses where it is possible to do so." Wife cites

*Carter v. Henry*, 525 S.W.3d 420 (Tex. App.—Fort Worth 2017, no pet.). That case concerned a suit for partition of real estate. *Id.* at 421. It did not involve a divorce or marital property. The case does not stand for the proposition that a court may not order the sale of a community asset that neither spouse wants to receive in the division of the marital estate.

To the extent Wife argues Texas law does not allow the trial court in the divorce decree to order the sale of a community asset, Wife is mistaken. The trial court in a divorce proceeding has authority to order the sale of a community asset the court determines is not subject to partition in kind. *See Vannerson v. Vannerson*, 857 S.W.2d 659, 672 (Tex. App.—Houston [1st Dist.] 1993, writ denied) ("In divorce proceedings, if the homestead cannot be partitioned, it is subject to sale and a division of the proceeds."). Numerous cases refer to trial courts' ordering the sale of community assets. *See, e.g.*, *Manning v. Jones*, No. 05-18-01140-CV, 2019 WL 6522183, at *1 (Tex. App.—Dallas Dec. 4, 2019, no pet.) ("The district court determined the Property was community property and ordered that it be sold."); *Matter of Marriage of Rangel*, 580 S.W.3d 675, 678 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (mem. op.) ("The trial court granted the divorce, ordered the marital residence sold, and ordered the sale proceeds divided equally among" the husband and the wife). In this case, the parties' testimony that they did not want to be awarded the company supports the trial court's conclusion that the company cannot be partitioned between the spouses.

–27–

Wife also argues that the trial court abused its discretion by ordering the shares sold without specifying a minimum price. The court ordered the company be sold for the highest offer following a procedure set out in the decree. Wife asserts that the highest offer might be significantly below the appraised values. It might well sell for less than those valuations. However, given that neither party wants to retain an interest in the company, the court could still conclude that the sale at any price was the best way to provide a just and right division of the community estate, having due regard for the rights of each party. *See* FAM. § 7.001.

Wife next asserts that Husband agreed with her that the sale price of the company would be "materially depressed" by a court-ordered "distressed sale." Wife cites to an e-mail Husband sent to the company's board of directors in June 2018, shortly after Wife filed for divorce. In the e-mail, Husband described the possible outcomes for the company, including that he would buy out Wife's position or that all of his and Wife's equity would be sold to a third party. Regarding this latter possibility, Husband stated:

> If the decision is made that a sale of the Company to a third party is the best approach, I am concerned that attempting to sell the Company to a third party in the midst of a divorce proceeding will be viewed by potential buyers as a distressed sale and will result in a depressed valuation.

During the trial, Husband testified that those comments concerned a sale in the middle of the divorce. Husband testified he was requesting a sale at the conclusion of the divorce. The record contains no evidence that the court-ordered sale following

–28–

the procedures in the divorce decree would result in a lower sales price for the company than would result under more normal business circumstances.

Wife also argues that the sale of the company will result in reduced proceeds to the parties because of the change-of-control bonuses and capital gains tax. The bonuses and tax demonstrate why ordering a sale of the company results in a just and right distribution. There are at least three possible scenarios:

(1) the court awards the company to one spouse, values the companies without adjusting for the bonuses and tax, and awards that value of other community assets to the other spouse;

(2) the court awards the company to one spouse, adjusts the value for the effect of the bonuses and tax, and awards that value of other community assets to the other spouse; and

(3) the court orders the sale of the company and divides the net proceeds after deduction for the amount of the bonuses and tax.

Under the first scenario, if the spouse receiving the company decides to sell it shortly after the decree, that spouse will have to pay all of the bonuses and tax, the spouse receiving other community property will not have to pay any of it, and the spouse receiving other community property will receive at least forty-two percent[7] more for the interest in the company than the spouse receiving the company. Under the second scenario, if the spouse receiving the company never sells it, and the bonuses and tax never come due, then the spouse receiving other community property will have received forty-two percent less than was appropriate. Under the third scenario,

---

[7] The evidence at trial showed the bonuses and tax would reduce the net proceeds from the sale of the company by about 42 percent.

the court's sale of the company, payment of the bonuses and tax, and equal distribution to the spouses of the remaining proceeds guarantees each spouse receives fifty percent of the net value of the company.

Wife asserts that not ordering the sale of the company would save the spouses millions of dollars because they would not have to pay the bonuses and tax. However, that would require the court to award control of the company to a spouse that no longer wanted to control the company, and if that spouse decided to sell the interest, would burden that spouse with the entirety of the bonuses and tax, an outcome the court could find in its discretion was neither just nor right.

We conclude Wife has not demonstrated the trial court abused its discretion by ordering the sale of the company. We overrule Wife's first issue.

## BROKERAGE ACCOUNTS

In her second issue, Wife contends the trial court's distribution was not just and right because the court awarded Husband a greater value of the brokerage accounts and other business and legal interests than were awarded to Wife.

The trial court's rendition of judgment included an eleven-page spreadsheet listing the parties assets and debt, valuing them, and assigning that value to either or both spouses. The spreadsheet shows Husband received $1.5 million of certain business and legal interests other than the company and Wife received $0 and that Husband received $16.7 million of the brokerage accounts while Wife received $14.2 million.

The PNA required the "net value of the community estate" be divided equally between the parties. It did not require each class of assets be divided equally. The end of the trial court's spreadsheet contains a total of the assets and debts awarded to each spouse, makes a nine-cent adjustment to equalize the division, and shows that each spouse received community assets and debts of $45,973,089.50, plus the net proceeds from the sale of the company and the value of some mineral interests that were divided equally between the parties and were not assigned a value by the trial court. In some asset categories, Husband received more than Wife, and in other asset categories, Wife received more than Husband. But the final net value of the community estate each spouse received was equal.

We conclude Wife has not shown the award to Husband of a greater share of the brokerage accounts and other business and legal interests resulted in a division that was not just and right or was otherwise an abuse of discretion. We overrule Wife's second issue.

### FISCHER RANCH

In her third issue, Wife contends the property division was not just and right because the trial court awarded Husband a ranch, valued at $4.8 million, but did not award Wife one half of the community funds, nearly $2 million, used by Husband during the marriage for the construction and renovation of the ranch.

The ranch was community property. Wife did not allege a claim of waste of community assets. Nor did she list a claim for reimbursement of these amounts in

her proposed division of the community estate. Wife cites *Bufkin v. Bufkin*, 259 S.W.3d 343 (Tex. App.—Dallas 2008, pet. denied). In that divorce case, the husband owned a ranch as his separate property. *Id.* at 342. One of the husband's separate businesses, a pipeline company, borrowed money to build a pipeline. *Id.* at 353. The husband guaranteed the debt, and he used his separate property as collateral. *Id.* The spouses had a prenuptial agreement that all liabilities benefitting separate property would be assumed by the owner of the separate property. *Id.* We stated there was no evidence that the borrowed money ever benefitted the community estate or that it was used to pay the spouses' living expenses. *Id.* We applied the parties' postnuptial agreement and concluded that the debt must be assumed by the husband because he was the owner of the separate-property company that borrowed the money. *Id.* *Bufkin* did not involve money spent to improve community property awarded to one spouse, and it has no applicability to the case before us.

Wife has not shown that the community funds spent to improve the ranch are not included in the ranch's valuation included in the court's memorandum of rendition of judgment. Nor has Wife presented any authority that the community is entitled to reimbursement for improvements to community property. We conclude Wife has failed to show that the property division is not just and right or that the trial court abused its discretion. We overrule Wife's third issue.

## HIGHPEAK ENERGY INVESTMENT

In her fourth issue, Wife contends the trial court should have awarded all of the investment in HighPeak Energy Partners to Wife instead of dividing it equally between Husband and Wife. She also complains about Husband's depletion of bank and brokerage accounts while the divorce was pending.

Wife testified that about a month before the trial, she made a million-dollar investment in HighPeak Energy Partners using one million dollars from her line of credit with BNY Mellon. The trial court awarded each spouse half the community's interest in the investment, and the court awarded Wife the debt on the line of credit used to purchase the investment, which the rendition memorandum showed was $1,980,000. The court's rendition memorandum showed that all these amounts were part of the court's equal distribution of the community's assets and debts. Wife states that the $1,980,000 debt did not include the million dollars used to purchase the investment and that Wife's actual debt on the line of credit was almost $3 million. The record does not support this assertion. Wife's proposed division of the community estate included the HighPeak investment for $1 million, but it shows the debt owing on the BNY Mellon line of credit was $1,980,000, the same as the trial court's judgment. Wife does not cite to any testimony that her proposed distribution's listing of the BNY Mellon line of credit was incorrect. Wife has not shown the division of property was not just and right or that the trial court abused its discretion.

Wife also asserts Husband depleted several bank accounts by $1,240,274 and brokerage accounts by $371,139 while the divorce was pending. Wife states in her brief, "the $1,240,274 depleted by [Husband] could have been allocated between both parties, with both [Wife] and [Husband] receiving additional funds." Wife, however, fails to mention the evidence of her own excessive spending during the litigation. Bryan Rice, husband's appraiser of the company, prepared a report examining Wife's spending before and after she filed for divorce. The report concluded that during the litigation, "it is clear that [Wife] has engaged in excessive and wasteful spending in the amount of at least $4.4 million."

The trial court's duty under the Family Code was to make a just and right division of the community estate, and the PNA provided the net value of the community estate should be divided between them equally. "The value of community assets is generally determined at the date of divorce or as close to it as possible." *In re Marriage of C.A.S.*, 405 S.W.3d 373, 385 (Tex. App.—Dallas 2013, no pet.). Wife does not assert the trial court used the wrong valuations for the accounts. The trial court divided the net community estate equally between the parties as required by the PNA.

Wife does not explain how Husband's depletion of the accounts constituted an asset of the community estate "that could have been allocated between both parties" with both parties "receiving additional funds." Moreover, given the allegations of waste and profligate spending by both parties, the trial court's decision

–34–

to award Husband the accounts at their value proven at trial was not an abuse of discretion and did not result in a division of the community estate that was not just and right. We overrule Wife's fourth issue.

**ATTORNEY'S FEES**

In her fifth issue, Wife contends the trial court erred by ordering her to pay the attorney's fees of the third-party defendants consisting of the company and its subsidiaries.

Wife alleged that the company and its subsidiaries were "necessary parties, because in their absence complete relief cannot be accorded to protect [Wife's] interest post-divorce with regard to her interest in each entity." During discovery, it became apparent that Wife was considering challenging the legality of the annual bonuses and change-of-control bonuses, which the parties sometimes called the profits participation interests, promised to the key employees. The company filed a counterclaim to Wife's petition seeking a declaratory judgment "that the aforementioned profits participation interests are legally enforceable." The company requested its attorney's fees under the Uniform Declaratory Judgments Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009. On the second day of the trial, Wife stipulated that the bonus agreements were legal and enforceable, and she agreed to a declaratory judgment to that effect.

Under section 37.009, "the court may award costs and reasonable and necessary attorney's fees as are equitable and just." A grant or denial of attorney's

–35–

fees in a declaratory judgment action lies within the sound discretion of the trial court. *Oake v. Collin Cty.,* 692 S.W.2d 454, 455 (Tex. 1985). The court's judgment will not be reversed on appeal absent a clear showing that it abused its discretion. *Id.*; *Wells Fargo Bank, N.A. v. Leath*, 425 S.W.3d 525, 539 (Tex. App.—Dallas 2014, pet. denied).

Wife argues that the trial court should not have awarded attorney's fees under section 37.009 because the company did not prevail on any declaratory judgment claim. We disagree. The company pleaded for a declaratory judgment that the bonus agreements were legal and enforceable, and the trial court declared in the decree that the bonus agreements "are all valid and enforceable obligations" of the company and that Husband "had, at a minimum, the requisite apparent authority to enter into each of the Agreements."

Wife also argues that the award of attorney's fees should be against both her and Husband "so as to be equitable and just." However, the issue is not whether imposition of attorney's fees against both parties would have been equitable and just; the issue is whether the imposition of attorney's fees against Wife alone is so inequitable and unjust as to constitute an abuse of discretion. Wife sued the company; Husband did not. Wife raised the issue of the enforceability of the bonus agreements; Husband did not. And the company brought its counterclaim against Wife, not Husband. Under these facts, we cannot conclude the trial court abused its

discretion by determining that imposing attorney's fees under section 37.009 against Wife alone was equitable and just.

We overrule Wife's fifth issue.

## CONCLUSION

We affirm the trial court's judgment.

/Lana Myers/
LANA MYERS
JUSTICE

191303F.P05



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

In the Mater of the Marriage of
A.W.E. and D.M.F.N.

No. 05-19-01303-CV

On Appeal from the 254th Judicial
District Court, Dallas County, Texas
Trial Court Cause No. DF-18-11265.
Opinion delivered by Justice Myers.
Justices Osborne and Carlyle
participating.

In accordance with this Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

It is **ORDERED** that appellee D.M.F.N. recover his costs of this appeal from appellant A.W.E.

Judgment entered this 4th day of March, 2021.