

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-25-00048-CV

———————————————

TRACEY LYNN WALTHER, Appellant

V.

DAVID MICHAEL WALTHER, Appellee

---

On Appeal from the 367th District Court
Denton County, Texas
Trial Court No. 22-0896-367

---

Before Kerr, Bassel, and Walker, JJ.
Memorandum Opinion by Justice Walker

## MEMORANDUM OPINION

## I. INTRODUCTION

Following a thirty-plus-year marriage, Appellee David Michael Walther and Appellant Tracey Lynn Walther[1] both filed for divorce. David pleaded insupportability, cruelty, waste, and fraud; Tracey pleaded insupportability and adultery.

A jury trial was held to determine the grounds for divorce. David testified that Tracey had repeatedly threatened and harassed him and that she had committed waste and fraud by spending large sums of marital funds. With respect to adultery, he admitted that he had had sexual intercourse with a woman who was not his spouse but explained that it occurred after Tracey told him that she was seeing other men and long after he had filed for divorce. Tracey contended that she did not commit waste or fraud because she and David had entered into an agreement that gave her the marital residence and its related funds. In support of this contention, she offered into evidence an unsigned copy of the agreement, but David objected, and the trial court excluded it.

The jury found that insupportability and Tracey's cruelty were grounds for divorce, that David was not guilty of adultery, and that Tracey had committed waste and fraud. A bench trial was then held to determine the division of the marital estate.

---

[1]For ease of reference, we will use the parties' first names.

David requested the trial court grant permanent injunctions against Tracey, order the sale of the marital residence, and award him attorney's fees. Following the bench trial, the trial court signed a final decree of divorce that, among other things, granted all of David's requests.

In four appellate issues, Tracey argues that the trial court erred by (1) granting permanent injunctions, (2) ordering the sale of the marital residence, (3) excluding the unsigned copy of the agreement, and (4) signing a final decree that was not a just and right division of the marital estate. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

David and Tracey married in July 1982. In February 2022, David filed a petition for divorce, and Tracey filed an answer and a counter-petition for divorce. David alleged that the marriage had become insupportable; Tracey claimed that he had committed adultery and, in the alternative, alleged that the marriage had become insupportable. During their divorce proceeeding, David and Tracey were subject to the trial court's standing order that governed their conduct and property management. Under this order, they were required to refrain from threatening and harassing behavior, preserve marital property, and limit the use of funds.

Before filing for divorce, David moved out of the marital residence and began staying in an RV. For several months after filing for divorce, Tracey constantly called, texted, and emailed him at all hours of the night and repeatedly arrived uninvited at the RV. Her behavior escalated in September 2022, and she was ultimately arrested

3

for making terroristic threats against David,[2] claiming that she wanted to maim or kill him.

In May 2023, David applied for a protective order against Tracey. After conducting a bench trial in July 2023 at which only David and Tracey testified, the trial court granted a two-year final protective order.[3] The order, among other restrictions, prohibited Tracey from threatening, harassing, or communicating with David. At her request, the trial court entered findings of fact and conclusions of law supporting the order's recitations that she "ha[d] committed family violence" and that "family violence [was] likely to occur in the future."

Around that time, Tracey made several substantial purchases, withdrawals, and transfers—without consulting David—including buying a new vehicle, paying for cosmetic surgery, and sending their children considerable monetary gifts.

In response to Tracey's conduct during the divorce, David filed an amended petition that (1) pleaded cruelty, waste, and fraud; (2) moved for the sale of the marital residence; and (3) requested permanent injunctions against her. The following month, Tracey requested a jury trial, and the case was set for trial on June 10, 2024.

---

[2]*See* Tex. Penal Code Ann. § 22.07(c)(1).

[3]We affirmed the trial court's granting of the protective order. *Walther v. Walther*, No. 02-23-00393-CV, 2024 WL 3978045, at *5 (Tex. App.—Fort Worth Aug. 29, 2024, pet. denied) (mem. op.).

At 3:20 a.m. on the morning of trial, Tracey filed a motion for leave to amend her pleadings, seeking amendments to include (1) confirmation of separate property, (2) cruel treatment, (3) reimbursement, and (4) attorney's fees. Prior to jury selection, David objected to her motion, and the trial court denied the motion based on surprise to David. The case proceeded to trial.

Kaufman County Sheriff's Deputy Katelyn Moore testified that she responded to two separate 911 calls in September 2022 concerning David and Tracey. David made the first 911 call regarding Tracey's uninvited arrival at the RV. When Deputy Moore arrived on scene, Tracey was no longer there. David explained to Deputy Moore that he had moved from Denton to Kemp,[4] that he was living in the RV to get away from Tracey, and that Tracey had entered the RV uninvited and refused to leave. Later that month, a second 911 call was placed by David and Tracey's adult daughter. Deputy Moore explained that she spoke with the daughter on the phone and that she sounded concerned for David's safety because Tracey had made comments to her about wanting to kill him.

At approximately 3:00 a.m. that same day, Deputy Moore discovered that Kemp police officers had encountered and subsequently stopped Tracey less than a mile from David's RV. Deputy Moore arrived on scene and spoke with Tracey, who stated "I'm not here to kill him. I'm here to maim him and beat his ass." Deputy

---

[4]Deputy Moore testified that Kemp is approximately one and a half hours from Denton.

5

Moore informed Tracey that she was under arrest for making terroristic threats, but when she attempted to effectuate the arrest, a physical altercation ensued.

Tracey grabbed Deputy Moore's hair, pulled her to the ground, tried to spit in her face, and bit her left finger. She was eventually subdued and placed in a patrol vehicle, and Deputy Moore conducted an inventory of Tracey's vehicle, discovering a hatchet in her trunk.[5] While in the patrol vehicle, Tracey proceeded to hit her head, kick the partition and door, urinate on herself, and make threats directed at David.[6] Deputy Moore testified that she believed Tracey was homicidal and wanted to hurt David. Tracey was arrested for making terroristic threats to a family member, assaulting a public servant, and resisting arrest.

Tracey testified that she and David were both in the army for twenty years. In the army, Tracey served as a military police officer, criminal investigator, criminal intelligence analyst, station commander, chief of military police, and combat military police liaison. After retiring from the army, she and David moved to Denton and purchased a home. In December 2021, they took out $200,000 in a cash-out refinance from the marital residence to make improvements on the property. Following an argument later that month, David moved out of the marital residence

---

[5]Tracey testified that the hatchet was in her trunk because she had a tree at home and "was using the hatchet to chop the vine." David testified that in their thirty-six years of marriage, he had never known Tracey to carry a hatchet in her vehicle.

[6]She also threatened to take Deputy Moore's life if she saw her on the street.

and began staying in an RV in Kemp. Upon moving out, he transferred $100,000 from their joint savings account to his separate checking account. In March 2022, David and Tracey reached an agreement where she allowed him to retrieve his personal items from the marital residence in exchange for his transferring back the $100,000. David transferred the money, and Tracey allowed him to collect his personal items.

Later that summer, Tracey made several purchases and transfers without conferring with David. She paid $14,000 for cosmetic surgery, admitting that it was not a necessary expenditure. She purchased a 2023 Cadillac for approximately $51,500, paying $20,000 from their account and taking out a loan for the remaining balance.[7] Tracey also gave their children $60,000 in monetary gifts. By July 2023, the remaining balance of the cash-out refinance was $30,000. When addressing these transactions at trial, Tracey testified that she believed that she and David had entered into a separation agreement in March 2022. She explained that David had agreed to transfer his interest in the marital residence to her and thus the funds were her separate property to do with as she wished.

David testified that after moving out of the marital residence, Tracey called, texted, and emailed him at "all hours of the day and night, over and over and over again." He explained that she also "pinged" his phone hundreds of times and that she

---

[7]Tracey admitted that the trial court's standing order prohibited her from making new encumbrances of debt.

would not stop harassing him. In March 2022, hoping to end her harassment, David signed an agreement and transferred $100,000 to Tracey. At that point, she had possession of the entire $200,000 from the cash-out refinance, but he explained that the $100,000 transfer was not a gift.

Tracey provided him with an unsigned copy of the agreement in the course of discovery, but he testified that he had reason to believe the unsigned copy was not the final version that they had signed in March 2022.[8] He explained that the agreement was intended to stop Tracey's harassment and that he did not believe the agreement was a division of property or a partition agreement. When asked by Tracey's attorney about the location of the signed agreement, David testified that he did not have it in his immediate possession and that he would have to look for it. Tracey then offered a copy of the unsigned agreement, arguing that the March 2022 agreement was a separation agreement that awarded her the marital residence—including the $200,000 from the cash-out refinance. David objected to the unsigned copy, and the trial court sustained his objection.

David further explained that despite the trial court's standing order, Tracey had continued to harass him. In September 2022, she arrived uninvited at his RV, and he caught her attempting to take his driver's license and concealed carry license. Later that month, he learned that she had been arrested for making threats to harm him. In

---

[8]Tracey later testified that she believed the unsigned copy was the same as the final version of the agreement from March 2022.

response to those threats, he moved the RV from Kemp to Princeton and did not tell her where he was staying. However, Tracey was able to locate the RV and arrived uninvited while he was not there. David watched from his security cameras as she removed items from inside the RV and unplugged the power cord to the RV. He also explained that she had violated the protective order's no-contact provision by calling him on his phone.

With respect to his alleged adultery, David explained that he had received text messages from Tracey in March 2022 regarding her seeing other men.[9] Consequently, he decided to engage in a new relationship and eventually had sexual intercourse with a woman in October or November 2022.[10] He testified that he had sex with the woman long after he filed for divorce and that he did not have sex with any other woman during the marriage. Based on David's admission that he had had sex with another woman, Tracey requested a directed verdict on the issue of his adultery. The trial court denied her request.

The jury unanimously found that insupportability and Tracey's cruelty were grounds for divorce. The jury further found that David was not guilty of adultery but

---

[9]Her text message stated "I was on the fence about dating. But these two men talk to me the way you talk with Peggy. Conversations with them are easy and respectful." Pictures of two different men accompanied her text message.

[10]In January 2024—while under the protective order—Tracey posted about David and the woman on social media. Her post read, "The punishment for adultery in the Bible was being stoned. Cheryl and David, are you ready?"

that Tracey was guilty of cruelty, that she had committed waste in the amount of $14,000, and that she had committed fraud in the amount of $105,000.

On September 11, 2024, the trial court conducted a bench trial to determine the division of the marital estate. Tracey moved for judgment notwithstanding the jury's verdict and requested that the trial court enter a judgment of adultery against David. The trial court denied her motion.

David testified and made various requests. First, he requested a disproportionate division of the marital estate based on the jury's verdicts that Tracey was guilty of cruelty and that she had committed waste and fraud. Second, he requested the sale of the marital residence, explaining that Tracey would not agree on a realtor or a listing price and that they could not speak to each other because of the protective order. Third, he requested various permanent injunctions against Tracey, including enjoining her from threatening or harassing him or taking or damaging his property. In support of this request, he offered a copy of the protective order. David testified that the protective order would expire in July 2025, and that he had remaining concerns about Tracey's behavior because she had continued to harass him despite the trial court's standing order and the protective order. He feared that Tracey would persist in her harassment of him and that his physical and emotional well-being would be at risk without permanent injunctions. Fourth, he requested attorney's fees.

Tracey requested that the trial court deny all of David's requests. She claimed that she was not a threat to David, that she had no desire to contact or see him, and

that permanent injunctions were not necessary for David to protect himself. Tracey also again attempted to argue that the March 2022 agreement was a separation agreement and that the marital residence was her separate property, but David objected, and the trial court sustained his objection.

At the conclusion of the bench trial, the trial court declared that David and Tracey were divorced. On November 7, 2024, the trial court signed the final decree of divorce. The final decree, among other things, ordered the sale and distribution of proceeds of the marital residence, enjoined Tracey from engaging in various threatening and harassing acts against David, and awarded David contingent appellate attorney's fees. At Tracey's request, the trial court made findings of fact and conclusions of law.[11] Tracey then filed this appeal.

## III. DISCUSSION

### A. THE PERMANENT INJUNCTIONS

In her first issue, Tracey argues that the trial court abused its discretion by granting permanent injunctions because they are supported by insufficient evidence. We disagree.

### 1. Standard of Review and Applicable Law

To be entitled to a permanent injunction, the party seeking the injunction must plead and prove (1) the existence of a wrongful act, (2) the existence of imminent

---

[11]She requested additional findings of fact and conclusions of law, and the trial court made additional findings of fact.

11

harm, (3) the existence of irreparable injury, and (4) the absence of an adequate remedy at law. *Risner v. Harris Cnty. Republican Party*, 444 S.W.3d 327, 339 (Tex. App.—Houston [1st Dist.] 2014, no pet.).

"When reviewing a judgment granting a permanent injunction, the standard of review is clear abuse of discretion." *Finley v. Finley*, No. 02-11-00045-CV, 2015 WL 294012, at *11 (Tex. App.—Fort Worth Jan. 22, 2015, no pet.) (mem. op.) (citing *Jamestown Partners, L.P. v. City of Fort Worth*, 83 S.W.3d 376, 384 (Tex. App.—Fort Worth 2002, pet. denied)); *see Arredondo v. Betancourt*, 383 S.W.3d 730, 734 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

An abuse of discretion occurs when a court acts arbitrarily, unreasonably, or without reference to guiding rules or principles. *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011). A trial court also abuses its discretion if it fails to apply the law correctly. *Id.* An abuse of discretion does not occur if some evidence of a substantive and probative character exists to support the trial court's decision and that decision constitutes a correct application of the law. *See Arredondo*, 383 S.W.3d at 740–41. Under an abuse of discretion standard, legal and factual insufficiency are not independent grounds for asserting error but are relevant factors in assessing whether a trial court abused its discretion. *In re Davis*, 30 S.W.3d 609, 614 (Tex. App.—Texarkana 2000, no pet.). We must consider only the evidence most favorable to the trial court's ruling and will uphold its judgment on any legal theory supported by the evidence. *Arredondo*, 383 S.W.3d at 740–41.

## 2. No Clear Abuse of Discretion

In its final decree of divorce, the trial court permanently enjoined Tracey from engaging in various acts of violence and harassment against David.[12] Tracey argues that the permanent injunctions are supported by insufficient evidence. To support this argument, she points us to the nature and scope of David's testimony at the bench trial.

While conceding that his testimony touched on each of the elements—wrongful act, imminent harm, irreparable injury, and adequate remedy at law—Tracey contends that David merely offered affirmative answers in response to leading prompts from his attorney. Thus she maintains that his answers provide insufficient evidence to support the permanent injunctions. But because her focus on his bench-trial testimony overlooks the entirety of the record—which contains other evidence that supports the permanent injunctions—we disagree. *See Huynh v. Blanchard*, 694 S.W.3d 648, 673–74 (Tex. 2024) (considering facts from the jury trial that supported the trial court's later ruling).

### a. Wrongful Act

"Generally, the purpose of injunctive relief is to halt wrongful acts that are either threatened or in the course of accomplishment." *Wiese v. Heathlake Cmty. Ass'n,*

---

[12]The final decree enumerated ten injunctions. Without identifying which specific injunction she seeks to challenge, Tracey broadly contends that the evidence was insufficient to support the permanent injunctions.

*Inc.*, 384 S.W.3d 395, 399 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *see Whitaker v. Dillard*, 16 S.W. 1084, 1085 (Tex. 1891) (observing that "the writ of injunction is used to prevent injuries, and not to afford remedy for injury inflicted").

The following evidence was admitted at the jury trial regarding Tracey's conduct during the divorce, including her:

- Threats to maim and physically harm David,

- Physical violence against a law enforcement officer,

- Numerous emails to David,

- Repeated phone calls to David,

- Hundreds of "pings" on David's phone,

- Repeated unwanted physical intrusions into and around the RV,

- Physical manipulation of David's personal property,

- Attempted taking of David's driver's license and concealed carry license, and

- Physical tampering with the electricity to the RV.

We conclude that there is legally and factually sufficient evidence to support the existence of a wrongful act. *See In re Davis*, 30 S.W.3d at 614; *Risner*, 444 S.W.3d at 339.

### b. Imminent Harm

"[A] finding of imminent harm can follow from a variety of circumstances, including actual injury, a pattern of actions, a threat to undertake harmful action, and other non-speculative bases to conclude that harm is impending." *See Huynh*, 694 S.W.3d at 679 ("Thus, 'showing that the defendant will engage in the activity sought to be enjoined' is sufficient to establish imminent harm for purposes of injunctive relief.").

David presented evidence that Tracey's threatening and harassing conduct was not speculative or theoretical; rather, her threats were made publicly and followed by action. First, Tracey unabashedly conveyed threats about David to her adult daughter and to Deputy Moore. Indeed, when Deputy Moore inquired about her making such threats, Tracey readily told Deputy Moore, "I'm here to maim him and beat his ass." Second, Tracey seemingly took action to effectuate these threats, as evidenced by her driving with a hatchet in her vehicle to David's RV at 3:00 a.m. Third, her threats were followed by acts of physical violence and harassment.

Tracey manifested her willingness to engage in physical violence during her encounter with law enforcement—grabbing Deputy Moore's hair, pulling her to the ground, trying to spit in her face, and biting her finger. Deputy Moore opined that Tracey was homicidal and wanted to hurt David. And although that instance of violence was directed at Deputy Moore rather than David, such an impetuous assault on a law enforcement officer sheds light on the imminency of her threats and the

15

legitimacy of David's concerns. Tracey's conduct ultimately led to the trial court's finding that "family violence had occurred and was likely to occur in the future."

Tracey also engaged in behavior demonstrating a disregard for authority. While under the trial court's standing order and the protective order—prohibiting her "from doing any act that is a threat that reasonably places [David] in fear of imminent physical harm, bodily injury, [or] assault"—Tracey posted on social media about stoning David. She also engaged in acts of harassment—arriving at David's RV uninvited; repeatedly calling, emailing, and texting him; and tampering with his property.

The protective order was set to expire in July 2025, and in light of her threatening and harassing conduct, David testified that he had continuing concerns that he would be at risk for imminent harm after the protective order's expiration. And although Tracey testified that that she was not a threat to David and that she had no desire to contact or see him, the trial court was not required to believe her. *See In re Marriage of Nadar*, No. 05-17-00537-CV, 2018 WL 1373900, at *6 (Tex. App.— Dallas Mar. 19, 2018, pet. denied) (mem. op.).

We conclude that there is legally and factually sufficient evidence to support the existence of imminent harm. *See In re Davis*, 30 S.W.3d at 614; *Risner*, 444 S.W.3d at 339.

### c. Irreparable Injury and Adequate Remedy at Law

An injury is irreparable if the injured party cannot be adequately compensated in damages or if the damages cannot be measured by any certain pecuniary standard. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002). A party has no adequate remedy at law when damages are incapable of calculation or the party to be enjoined is incapable of responding in damages. *See Recon Exploration, Inc. v. Hodges*, 798 S.W.2d 848, 851 (Tex. App.—Dallas 1990, no writ). Here, David testified that there is no remedy other than a permanent injunction that would protect him from Tracey. Based on the nature and extremity of her conduct, we agree.

As detailed above, Tracey made multiple threats of violence toward David and repeatedly harassed him. Similar threats of violence have served as the basis for permanent injunctions.

In *Livingston v. Livingston*, a stepson called his stepmother on the phone after an argument and made the following threat: "I'm going to hurt you. I am going to f* * *ing kill you. I'm going to kill you and your motherf* * *ing son." 537 S.W.3d 578, 584 (Tex. App.—Houston [1st Dist.] 2017, no pet.). Based on this threat, the stepmother sued him for intentional infliction of emotion distress and requested permanent injunctive relief. *Id.* "[The stepmother] indicated that injunctive relief was necessary to protect her from 'the continuing nature and immediacy of the threat posed by [the stepson] to [her] safety, security, and life'; thereby indicating that the threatened violence posed an irreparable and immediate injury." *Id.* at 588.

17

The case proceeded to a jury trial, and the stepmother testified that her stepson was "furious" and that he was "very, very angry" and "out of control." *Id.* She testified that he had threatened her, expressly telling her that "he had had it" and that he was going to hurt and kill her. *Id.* The jury found that the stepson had intentionally inflicted emotional distress on the stepmother.[13] *Id.* at 585. Nonetheless, the jury found that she had suffered zero dollars in actual damages. *Id.* Following the jury's verdict, the trial court granted several injunctions against the stepson. *Id.* He appealed and argued that the finding of intentional infliction of emotional distress did not support the injunctive relief awarded by the trial court and that the evidence was insufficient to support the permanent injunctions. *Id.* at 586–95.

The Houston court disagreed and affirmed the permanent injunctions, concluding that the trial court had sufficient evidence to exercise its discretion in granting the permanent injunctions given the manner in which the stepson made the threats and the gravity of their nature. *Id.* at 598. We conclude the same in this case.

Our above discussion of imminent harm supports this conclusion. Under the facts of this case, Tracey's blatant threats coupled with her acts of physical violence and disregard for authority leads us to conclude that there was sufficient evidence for the trial court to determine that David's damages were immeasurable by any certain

---

[13]The stepmother also sued the stepson for assault and false imprisonment, but the jury found that he had not assaulted or falsely imprisoned her. *Id.*

18

pecuniary standard and incapable of calculation.[14]  *See Livingston*, 537 S.W.3d at 589. Thus we conclude that there is legally and factually sufficient evidence to support the existence of an irreparable injury and an inadequate remedy at law.  *See In re Davis*, 30 S.W.3d at 614; *Risner*, 444 S.W.3d at 339; *see also Livingston*, 537 S.W.3d at 589.

Accordingly, we hold that Tracey has failed to show that the trial court clearly abused its discretion by granting the permanent injunctions.  *See Finley*, 2015 WL 294012, at *11.

We overrule Tracey's first issue.

## B.  THE SALE OF THE MARITAL RESIDENCE

In her second issue, Tracey maintains that the trial court erred by ordering the sale of the marital residence because it was her homestead and was thus protected by the Texas Constitution from forced sale.  We disagree.

### 1.  Standard of Review and Applicable Law

Homestead rights have historically enjoyed strong protections in Texas.  *See Grant v. Clouser*, 287 S.W.3d 914, 919 (Tex. App.—Houston [14th Dist.] 2009, no pet.); *see also* Tex. Const. Art. XVI, § 50(a) (providing for the protection of the homestead from forced sale for the payment of all debts except for enumerated circumstances). The "fundamental idea connected with a homestead is unquestionably associated with

---

[14]And Tracey does not explain how David would be adequately compensated by monetary damages, how such damages could be calculated, or what other remedy at law was adequate to address such injuries.

19

that of a place of residence for the family, where the independence and security of a home may be enjoyed, without danger of its loss, or harassment and disturbance." *Cocke v. Conquest*, 35 S.W.2d 673, 678 (Tex. 1931). "It is a secure asylum of which the family cannot be deprived by creditors." *Id.*

But partition rights have also been well established. The law will not force a reluctant joint owner of real property to maintain joint ownership. *Bowman v. Stephens*, 569 S.W.3d 210, 220 (Tex. App.—Houston [1st Dist.] 2018, no pet.). Instead, joint owners of real property "may compel a partition of the interest or the property among the joint owners." Tex. Prop. Code Ann. § 23.001. And the right to partition has been characterized as "absolute." *Carter v. Charles*, 853 S.W.2d 667, 671 (Tex. App.—Houston [14th Dist.] 1993, no writ). Partitions may be in kind—the property is divided into separate parcels and each parcel is allotted to a separate owner—or by sale—the property is sold and sale proceeds are divided among the owners. *Bowman*, 569 S.W.3d at 220.

The threshold question is whether the property is susceptible to partition in kind, or if it is incapable of partition in kind because a fair and equitable division cannot be made. *See* Tex. R. Civ. P. 761, 770. Texas courts have held that single-family homes—like the marital residence in the present case—are not susceptible to partition in kind. *See Beago v. Ceres*, 619 S.W.2d 293, 295 (Tex. App.—Houston [1st Dist.] 1981, no writ); *see also Rough v. Rough*, No. 05-90-00843-CV, 1991 WL 97521, at *4 (Tex. App.—Dallas June 4, 1991, writ denied) (not designated for publication)

20

(observing that "a single[-]family home is generally not suitable for partition in kind"). If the trial court determines that the property is not susceptible to partition in kind, then it must order partition by sale. Tex. R. Civ. P. 770.

"The rules of equity govern the trial court's partition of property." *Bowman*, 569 S.W.3d at 223. In matters of equity, we review the trial court's decision for an abuse of discretion. *See Wagner & Brown, Ltd. v. Sheppard*, 282 S.W.3d 419, 428–29 (Tex. 2008).

### 2. No Violation of the Texas Constitution

Tracey contends that because the marital residence was her homestead, the trial court's order partitioning it by sale "was a violation of the Texas Constitution."[15] But she fails to account for the trial court's power to order the sale of the homestead and the partition of the proceeds. *See Bowman*, 569 S.W.3d at 220. And that is exactly what the trial court did in the final decree of divorce.

The fact that Tracey was living in the marital residence does not defeat David's right to partition the property. *See Grant*, 287 S.W.3d at 920 ("The general rule is that homestead rights attaching to property interests held by a cotenant are subordinate to

---

[15]She cites *Eggemeyer v. Eggemeyer* in support of this assertion. *See* 554 S.W.2d 137, 140 (Tex. 1977). But the facts in that case are distinguishable from those in this appeal. In *Eggemeyer*, the trial court divested the husband of his separate property by transferring the title of his separate property to the wife. *Id.* Here, the trial court did not make a finding that the marital residence was Tracey's separate property, and thus there was no such divestment, as the marital residence that Tracey claims as her homestead is community property.

another cotenant's right to partition."). The trial court's "power to order a 'just and right division' also includes the power to order the sale of the homestead and the partition of the proceeds." *Laster v. First Huntsville Props. Co.*, 826 S.W.2d 125, 131 (Tex. 1991); *see Kirkwood v. Domnau*, 16 S.W. 428, 429 (Tex. 1891) ("[I]t was not within the meaning of the provision of the constitution that forbids a forced sale of a homestead. To so hold would require that the constitution should be construed to forbid a partition of land owned by tenants in common when it is resided upon by one of the co-tenants, who happens to be entitled to the homestead exemption, and it is incapable of being equitably partitioned without being sold."); *In re Marriage of Cruey*, No. 09-21-00125-CV, 2022 WL 3905766, at *9 (Tex. App.—Beaumont Aug. 31, 2022, no pet.) (mem. op) ("In a division of property upon a divorce, the trial court has broad power to order a just and right division of a divorcing couple's estate, including the power to order the sale of the couple's home and to partition the proceeds.").

Here, the trial court evidently found that the marital residence was not susceptible to partition in kind and thus ordered its partition by sale.[16]  *See Beago*, 619 S.W.2d at 295; Tex. R. Civ. P. 770. Accordingly, because the trial court's power to make a just and right division includes the power to order the sale of the homestead and to partition the proceeds, we hold that there is no constitutional

---

[16]Tracey does not argue that the marital residence was susceptible to partition in kind. Instead, she maintains that the trial court lacked the authority to order its sale because it was her homestead.

22

infirmity or abuse of discretion in the trial court's final decree ordering partition by sale of the marital residence. *See Laster*, 826 S.W.2d at 131.

We overrule Tracey's second issue.

## C. THE MARCH 2022 AGREEMENT

In her third issue, Tracey asserts that the trial court erred by preventing her from enforcing the March 2022 agreement. Tracey grounds this assertion on the trial court's denial of her motion for leave to amend her pleadings. But her complaint stems from the trial court's refusal to admit an unsigned copy of the March 2022 agreement. Assuming without deciding that the trial court erred by denying her motion for leave to amend—and that she had to plead specific separate property by way of the agreement[17]—we conclude that any such error was harmless because the

---

[17]Texas appellate courts have reached conflicting conclusions regarding whether specific separate property claims must be pleaded in divorce proceedings. *See e.g., Anderson v. Anderson*, 282 S.W.3d 150, 155 (Tex. App.—El Paso 2009, no pet.) (holding that a party's failure to plead a separate property claim in a divorce proceeding does not bar the trial court from characterizing residential property as separate property); *Chavez v. Chavez*, 269 S.W.3d 763, 766 (Tex. App.—Dallas 2008, no pet.) (reasoning that when the wife claimed "an interest" in the property in her pleadings, the husband's general denial properly raised the issue of ownership); *Smith v. Smith*, 143 S.W.3d 206, 213 (Tex. App.—Waco 2004, no pet.) (mem. op.) (discussing that the wife had no live pleading claim for separate property); *Weatherall v. Weatherall*, 403 S.W.2d 524, 526 (Tex. App.—Houston 1966, no writ) (reversing a divorce judgment where the trial court found property to be separate property without supporting pleadings, stating that such error required reversal because "there was no pleading to support such recovery"). We make no conclusion on this conflict because we need not address whether specific separate property claims must be pleaded in divorce proceedings to reach the merits of this issue.

23

trial court did not abuse its discretion by excluding the unsigned copy of the March 2022 agreement offered by Tracey.

## 1. Standard of Review and Applicable Law

We review a trial court's exclusion of evidence for an abuse of discretion. *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018). "A trial court abuses its discretion if it acts without reference to guiding rules and principles such that the ruling is arbitrary or unreasonable." *Brewer v. Lennox Hearth Prods., LLC*, 601 S.W.3d 704, 717 (Tex. 2020). An appellate court must uphold the trial court's evidentiary ruling if the record shows any legitimate basis for the ruling. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). "If a trial court abuses its discretion and erroneously excludes evidence, then the question is whether the error probably caused the rendition of an improper judgment." *JBS Carriers*, 564 S.W.3d at 836 (internal quotation omitted); *see* Tex. R. App. P. 44.1(a)(1).

## 2. The Unsigned Copy

Tracey relied on Texas Rule of Evidence 1004 (a) and (d) to admit an unsigned copy of the March 2022 agreement. *See* Tex. R. Evid. 1004. Rule 1004 provides that

> [a]n original is not required and other evidence of the content of a writing, recording, or photograph is admissible if:
>
> > (a) all the originals are lost or destroyed, unless the proponent lost or destroyed them in bad faith; [or]
> >
> > . . .

24

(d)   the party against whom the original would be offered had control of the original; was at that time put on notice, by pleadings or otherwise, that the original would be a subject of proof at the trial or hearing; and fails to produce it at the trial or hearing.

*Id.*

The trial court refused to admit the unsigned copy of the March 2022 agreement, and it had several valid reasons for doing so. First, although Rule 1004(a) permits the admissibility of a non-original document if "all the originals are lost or destroyed," there was conflicting evidence regarding the status of the signed agreement. Tex. R. Evid. 1004(a). David testified that he and Tracey both had a copy of the signed agreement. He explained that he provided a copy of the agreement to Tracey during discovery, but he was unsure if it was the signed or unsigned version. Tracey's attorney asked David if he possessed a signed, executed, and notarized copy of the agreement, and he responded "I'm sure I have someone -- I'm sure I have one -- a signed copy somewhere." He further testified that "I haven't looked for it. I had it in my possession, what's that, over two years ago now, or in 2022, and I don't know where it's been placed since then." Her attorney then directly asked him whether the signed agreement had been lost, and David explained "I haven't looked for it. I'd have to try and look for it." Thus there was some evidence that the signed agreement was not lost or destroyed.

Second, Rule 1004(d) permits the admissibility of a non-original document if "the party against whom the original would be offered had control of the original; was

25

at that time put on notice, by pleadings or otherwise, that the original would be a subject of proof at the trial or hearing; and fails to produce it at the trial or hearing." Tex. R. Evid. 1004(d). But Tracey's pleadings, motions, and exhibit list[18] leading up to trial made no mention whatsoever of the March 2022 agreement, and thus afforded no notice to David that she would seek to use the signed agreement or that it would be subject to proof at trial.[19]

We conclude that the trial court's exclusion of the unsigned copy of the March 2022 agreement was not arbitrary or unreasonable.[20] *Brewer*, 601 S.W.3d at 717. Accordingly, we hold that the trial court did not abuse its discretion by excluding the unsigned copy of the March 2022 agreement.

---

[18]Tracey's attorney conceded that the March 2022 agreement was not included on her exhibit list for trial.

[19]Her attorney also admitted that Tracey had informed him in December 2024 that she and David had signed an agreement in March 2022 regarding their property. Despite this information, no pleadings, motions, or exhibit lists were filed that referenced or alluded to the March 2022 agreement.

[20]We note that David disputed the authenticity of Tracey's version of the unsigned agreement. He testified that there had been several versions of the agreement and that the unsigned copy "generally look[ed] like one of the versions." But when asked by Tracey's attorney if the unsigned copy was the same as the signed agreement from March 2022, David stated "I have reason to believe that it may not be the actual version of the signed copy." He explained that a draft version of the agreement had been transferred back and forth between him and Tracey before it was signed and that he could not verify that the unsigned copy was the same as the signed final version.

26

We overrule Tracey's third issue.[21]

## D. THE FINAL DECREE OF DIVORCE

In her fourth issue, Tracey contends that the final decree of divorce is not a just and right division. She frames this issue as an attack on the final decree, but in substance, she challenges the trial court's (1) award of contingent appellate attorney's fees to David and (2) denial of her motion for judgment notwithstanding the verdict on the issue of David's adultery.[22]

### 1. Award of Contingent Appellate Attorney's Fees

Tracey asserts that the trial court abused its discretion by awarding David contingent appellate attorney's fees in the final decree. We disagree.

### i. Standard of Review and Applicable Law

"In a suit for dissolution of a marriage, the [trial] court may award reasonable and necessary attorney's fees, court costs, and expenses." Tex. Fam. Code Ann.

---

[21]Tracey has cited no authority—nor have we found any—that specifically addresses the interplay between Texas Rule of Evidence 1004 and Texas Family Code Section 4.104. On one hand, Texas Rule of Evidence 1004 permits admission of secondary evidence when original documents are unavailable, while on the other, Texas Family Code Section 4.104 establishes strict requirements for valid partition agreements, mandating that such agreements must be in writing and signed by both parties. *See* Tex. R. Evid. 1004; Tex. Fam. Code Ann. § 4.104. Here, Tracey contends that Rule 1004 permits the admission of the unsigned March 2022 agreement, but she neglects to explain how that rule would supplant Section 4.104's signature requirement.

[22]She does not challenge the jury's verdicts that she was guilty of cruelty and that she committed waste and fraud.

§ 6.708(c). We review a trial court's decision to award attorney's fees for an abuse of discretion. *Bocquet v. Herring*, 972 S.W.2d 19, 21 (Tex. 1998).

The trial court has broad discretion in deciding whether to award reasonable attorney's fees in a divorce action—including the award of contingent appellate attorney's fees. *See, e.g., In re Marriage of Comstock*, 639 S.W.3d 118, 129 (Tex. App.—Houston [1st Dist.] 2021, no pet.) (concluding that the trial court properly conditioned the award of appellate attorney's fees upon wife's unsuccessful appeal); *Seitz v. Seitz*, 608 S.W.3d 272, 282 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (holding no abuse of discretion in awarding appellate attorney's fees in a final decree of divorce); *Mansfield v. Mansfield*, No. 04-18-00551-CV, 2019 WL 6138984, at *4 (Tex. App.—San Antonio Nov. 20, 2019, pet. denied) (mem. op.) (explaining that a trial court's award of attorney's fees may include appellate attorney's fees as long as the award is conditioned on which party prevails on appeal); *Messier v. Messier*, 458 S.W.3d 155, 169 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (modifying the trial court's award of appellate fees to make it contingent on the wife's success on appeal).

### ii. No Abuse of Discretion

The trial court awarded David contingent appellate attorney's fees in the final decree of divorce as part of its just and right division of the marital estate.[23] Tracey maintains that this award was an abuse of discretion because the trial court did not

---

[23]The trial court properly conditioned its award of appellate attorney's fees on "[Tracey's] pursuit of an ultimately unsuccessful appeal."

award the fees under Texas Family Code Section 6.709.[24] Section 6.709 provides that "the trial court may render a temporary order as considered equitable and necessary for the preservation of the property and for the protection of the parties during an appeal, including an order directed toward one or both parties . . . requiring the payment of reasonable and necessary attorney's fees, court costs, and expenses." Tex. Fam Code Ann. § 6.709(a)(2).

But she has cited no authority that prevented the trial court from awarding contingent appellate attorney's fees in the final decree or that required such fees to be exclusively awarded in a temporary order under Section 6.709. In light of the foregoing authorities confirming contingent appellate attorney's fees in final decrees of divorce, we conclude that Tracey has failed to show that the trial court was precluded from awarding appellate attorney's fees in the final decree or that Section 6.709 was the trial court's exclusive avenue for awarding such fees. Accordingly, we hold that the trial court did not abuse its discretion by awarding David contingent appellate attorney's fees in the final decree. *See* Tex. Fam. Code Ann. § 6.708(c); *In re Marriage of Comstock*, 639 S.W.3d at 129.

---

[24]She does not, however, challenge the sufficiency of the evidence supporting the trial court's award of appellate attorney fees nor does she contend that the trial court failed to make the award contingent on the outcome of her appeal.

## 2. Motion for Judgment Notwithstanding the Verdict

Tracey next maintains that the trial court erred by denying her motion for judgment notwithstanding the verdict (JNOV) on the issue of David's adultery.[25] We disagree.

### i. Standard of Review and Applicable Law

We review the denial of a motion for JNOV under a legal sufficiency or "no evidence" standard, meaning we credit evidence favoring the jury verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *See Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009); *City of Keller v. Wilson*, 168 S.W.3d 802, 823, 827 (Tex. 2005). "[E]very reasonable inference deducible from the evidence is to be indulged in" support of the jury's finding. *Bustamante v. Ponte*, 529 S.W.3d 447, 456 (Tex. 2017) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)); *see City of Keller*, 168 S.W.3d at 822. We will uphold the denial of a motion for JNOV if more than a scintilla of competent evidence supports the verdict. *Wal-Mart Stores, Inc. v. Miller*, 102 S.W.3d 706, 709 (Tex. 2003). Evidence exceeds a scintilla when it rises to a level that would enable reasonable and fair-minded people to differ in their conclusions. *Havner*, 953 S.W.2d at 711.

---

[25]Tracey's appellate brief asserts that the trial court's "refusal to grant [JNOV] on the issue of adultery was an abuse of discretion." But, as we explain below, she recites the incorrect standard of review.

30

The Texas Family Code assigns the determination of grounds for divorce to the discretion of the trial court. *See Applewhite v. Applewhite*, No. 02-12-00445-CV, 2014 WL 787828, at *2 (Tex. App.—Fort Worth Feb. 27, 2014, no pet.) (mem. op.) (citing Tex. Fam. Code Ann. §§ 6.001, 6.003). A trial court "may grant a divorce in favor of one spouse if the other spouse has committed adultery." Tex. Fam. Code Ann. § 6.003. Adultery means the "voluntary sexual intercourse of a married person with one not the spouse." *In re S.A.A.*, 279 S.W.3d 853, 856 (Tex. App.—Dallas 2009, no pet.).

## ii. Evidence Supports the Jury's Verdict

Tracey argues that the trial court erred by denying her motion for JNOV because David's admission on this issue proved as a matter of law that he was guilty of adultery. Indeed, David admitted that he had sexual intercourse with a woman who was not his spouse, but the relevant testimony encompassed more than just that admission.

David explained that he sought out a new relationship only after Tracey informed him that she was starting to date other men and that he had sex with the woman long after he filed for divorce.[26] Along those lines, he did not have sex with any other woman who was not his spouse before filing for divorce. With respect to

---

[26]David filed his petition for divorce in February 2022, Tracey informed him that she was seeing other men in March 2022, and he had sex with a woman who was not his spouse in October or November 2022.

Tracey's testimony, she did not claim that David's having sex with another woman was the cause or reason for their divorce nor did she present any evidence that he had sex with the woman before he filed for divorce.[27]

The jury found insupportability and Tracey's cruelty as grounds for the divorce. And despite David's having sex with a woman who was not his spouse, the jury found him not guilty of adultery.

Tracey filed a motion for JNOV and argued that

> [t]he Court should enter judgment for [Tracey] notwithstanding the verdict on the question of whether [David] committed adultery because the evidence proved conclusively by his own admission that he committed adultery during the marriage. This admission established this fact as a matter of law.

The trial court denied her motion, and she contends that the trial court's denial constituted error because David's admission established his adultery as a matter of law. But our holding in *Applewhite* rebuts this contention. *See Applewhite*, 2014 WL 787828, at *2. We explained in *Applewhite* that

> [t]he family code provides that "the court *may* grant a divorce without regard to fault if the marriage has become insupportable because of discord or conflict of personalities that destroys the legitimate ends of the marital relationship and prevents any reasonable expectation of reconciliation." *See* Tex. Fam. Code Ann. § 6.001 (West 2006) (emphasis added). It also provides that "[t]he court *may* grant a divorce in favor of one spouse if the other spouse has committed adultery." *Id.* § 6.003 (West 2006) (emphasis added). Here, the trial court granted the divorce

---

[27]One month before David filed for divorce, Tracey sent him a text message that read "You are not cheating on me or physically abusing me. I made the bed and have to lay in it."

only on the ground of insupportability. Although it was stipulated that [husband] had two affairs, [wife] pleaded insupportability as a ground for the divorce, and she does not challenge the sufficiency of the evidence to support the insupportability determination. Thus, in light of the record, and because the family code assigns the divorce-ground determination to the discretion of the trial court, we hold that the trial court did not abuse its discretion by not instead finding, or by not additionally finding, adultery as a ground for the divorce.

*Id.* Notwithstanding David's admission, the jury was not required to find that his adultery was a ground for divorce. *See id.* Many of our sister courts have held the same. *See, e.g., Matter of Marriage of Wallis*, No. 07-20-00247-CV, 2021 WL 2006647, at *1 (Tex. App.—Amarillo May 19, 2021, no pet.) (mem. op.) (holding that a trial court "need not grant the divorce on that basis, even if evidence illustrates that a party committed it"); *Oliver v. Oliver*, No. 09-18-00208-CV, 2020 WL 1173704, at *9 (Tex. App.—Beaumont Mar. 12, 2020, no pet.) (mem. op.) (holding that the trial court could have believed that the husband's relationship with another woman did not begin until after his separation and after the parties decided to divorce, and thus the trial court could have concluded that his adultery was not a ground for the dissolution of the marriage); *Matter of Hashimi*, No. 14-17-00488-CV, 2018 WL 4136903, at *6 (Tex. App.—Houston [14th Dist.] Aug. 30, 2018, no pet.) (mem. op.) (holding that "even if sufficient evidence of adultery existed in this case, the trial court did not abuse its discretion by granting a divorce solely on the basis of insupportability"); *Lisk v. Lisk*, No. 01-04-00105-CV, 2005 WL 1704768, at *5 (Tex. App.—Houston [1st Dist.] July 21, 2005, no pet.) (mem. op.) (affirming divorce on ground of

insupportability because "Husband's admission to an affair does not mean the trial court was required to grant Wife the divorce on the grounds of adultery, although it would have been within its discretion to do so"); *Martel v. Martel*, No. 05-99-00177-CV, 2001 WL 996052, at \*3 (Tex. App.—Dallas Aug. 31, 2001, no pet.) (op. on reh'g) (holding that the wife "cannot be faulted for the breakup of the marriage on this ground where the adultery did not occur until after the separation").

Here, although David admitted to having sex with a woman who was not his spouse, he testified that it did not occur until after Tracey suggested that she was seeing other men and after he had filed for divorce. He also confirmed that he did not have sex with another woman before filing for divorce. The jury could have believed that David's relationship with the other woman did not begin until after his separation from Tracey and after they decided to divorce, and thus the jury could have concluded that David's adultery was not a ground for the dissolution of the marriage. *See Oliver*, 2020 WL 1173704, at \*9; *Martel*, 2001 WL 996052, at \*3. We conclude that more than a scintilla of evidence supports the jury's verdict that David was not guilty of adultery. Accordingly, we hold that trial court did not err by denying Tracey's motion for JNOV. *See Wal-Mart Stores, Inc.*, 102 S.W.3d at 709.

We overrule Tracey's fourth issue.

## IV. CONCLUSION

Having overruled Tracey's four issues, we affirm the trial court's final decree of divorce. *See* Tex. R. App. P. 43.2(a).

34

/s/ Brian Walker

Brian Walker
Justice

Delivered:  March 12, 2026